**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Bobby Ray MOSLEY, Defendant–
Appellant.**

No. 90–8100.

United States Court of Appeals,
Tenth Circuit.

May 28, 1992.

Ronald G. Pretty, Cheyenne, Wyo., for defendant-appellant.

John R. Green, Asst. U.S. Atty. (Richard A. Stacy, U.S. Atty., Cheyenne, Wyo., and John R. Barksdale, Asst. U.S. Atty., Casper, Wyo., on the brief), for plaintiff-appellee.

Before SEYMOUR and EBEL, Circuit Judges, and MATSCH, District Judge.*

---

* The Honorable Richard P. Matsch, United States District Judge for the District of Colorado, sitting by designation.

EBEL, Circuit Judge.

This appeal addresses whether conduct by the Wyoming Division of Criminal Investigation ("DCI") was so outrageous as to violate the Defendant's due process rights and thus bar prosecution. We hold that the DCI's conduct was not sufficiently outrageous to warrant dismissal. Additionally, we hold that the district court's reading of the indictment to the jury, during which it added a comment pertaining to one of the words in the indictment, did not amount to a substantial amendment of the indictment so as to require a retrial. Finally, we hold that the district court correctly held that it did not have discretion to depart below the minimum sentence required by statute. Accordingly, we affirm the Defendant's conviction and sentence.

## FACTS

The DCI, upon receiving complaints of drug trafficking from citizens in Wheatland, Wyoming, assigned Special Agent Mike Arter to conduct an undercover investigation in the area. As part of this investigation, Arter frequented the Commodore Bar in Wheatland posing as a high-stakes drug dealer in an attempt to attract the attention of anyone involved in drug trafficking in the area.

After the operation had continued for approximately three months without success, the Defendant, Bobby Ray Mosley, approached Arter and asked Arter to sell him some marijuana. Arter first told Mosley that he would try to find some marijuana, but later informed him that he could not find any. Instead, Arter suggested that he could sell Mosley a pound of cocaine at what Arter admitted was a "good price" of $10,000. R., Vol. II, at 29. Mosley indicated that he wanted to buy a lesser quantity, and Arter eventually agreed to sell him four ounces of cocaine for $3,200. After they reached this agreement, Arter offered to "front" an additional four ounces of cocaine to Mosley—i.e., to provide additional drugs on credit with the understanding that Mosley would pay for the

drugs five days after receiving them—and Mosley agreed.

At one point during the course of their negotiations, Mosley failed to show up for a meeting that he and Arter had scheduled at the Commodore. Arter had a barmaid who was friendly with Mosley, and with whom Arter had been sexually involved, telephone Mosley to remind Mosley of his appointment with Arter. Thereupon, Mosley met with Arter and the two struck their deal.

At an arranged meeting, Mosley gave Arter $3,200 and Arter gave Mosley eight ounces of cocaine, four sold outright and four on credit. Immediately thereafter, Mosley was arrested. He was tried, convicted, and sentenced in federal court for possession of with intent to distribute eight ounces of cocaine under 21 U.S.C. § 841(a)(1), conspiracy to distribute the same under 21 U.S.C. § 846,[1] and carrying a firearm during a drug trafficking offense under 18 U.S.C. § 924(c).

## DISCUSSION

### I. Outrageous Conduct

Mosley asserts that the government's conduct during its investigation of him was so outrageous that it violated his due process rights. Accordingly, he argues, the government should not be allowed to invoke the judicial system in connection with his case, and the charges against him should be dismissed.

### A. The existence of the outrageous conduct defense

■ When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct. A defendant may challenge such conduct by means of the outrageous conduct defense, which is predicated on the Due Process Clause of the Fifth Amendment to the United States

---

1. Mosley's co-conspirator, Samuel Hoth, was convicted of aiding and abetting Mosley's possession with intent to distribute. Hoth died just before sentencing in this case.

Constitution.[2] The defense of outrageous conduct is distinct from the defense of entrapment in that the entrapment defense looks to the state of mind of the defendant to determine whether he was predisposed to commit the crime for which he is prosecuted. *See Jacobson v. United States, —— U.S. ——,* 112 S.Ct. 1535, 1540, 118 L.Ed.2d 147 (1992). The outrageous conduct defense, in contrast, looks at the government's behavior. *See United States v. Gamble,* 737 F.2d 853, 858 (10th Cir.1984).

The outrageous conduct defense was first enunciated in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973): "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." *Id.* at 431–32, 93 S.Ct. at 1643 (citing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). Several years later, in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), a majority of Justices left open the possibility that an outrageous conduct defense based on the Due Process Clause might be invoked successfully even if the entrapment defense is unavailable because of predisposition. *Id.* at 495, 96 S.Ct. at 1653 (Powell, J., with Blackmun, J., concurring); *id.* at 496–97, 96 S.Ct. at 1653 (Brennan, J., with Stewart & Marshall, JJ., dissenting).

Notwithstanding the lack of a clear holding on outrageous conduct by the Supreme Court, most of the circuits, including this one, have recognized the viability of the outrageous conduct defense. *See, e.g., United States v. Jacobson,* 916 F.2d 467, 469 (8th Cir.1990) (en banc), *rev'd on other grounds,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 147 (1992); *United States v. Nichols,* 877 F.2d 825, 827 (10th Cir.1989); *United States v. Simpson,* 813 F.2d 1462, 1464–65 (9th Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987); *United States v. Arteaga,* 807 F.2d 424, 426 (5th Cir.1986); *United States v. Kelly,* 707 F.2d 1460, 1468 (D.C.Cir.), *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983); *United States v. Capo,* 693 F.2d 1330, 1336 (11th Cir.), *cert. denied,* 460 U.S. 1092, 103 S.Ct. 1793, 76 L.Ed.2d 359, *modified on other grounds sub nom. United States v. Lisenby,* 716 F.2d 1355 (11th Cir.1983); *United States v. Myers,* 692 F.2d 823, 837 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983); *United States v. Jannotti,* 673 F.2d 578, 607 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Johnson,* 565 F.2d 179, 182 (1st Cir.1977), *cert. denied,* 434 U.S. 1075, 98 S.Ct. 1264, 55 L.Ed.2d 780 (1978); *United States v. Quintana,* 508 F.2d 867, 878 (7th Cir.1975). We know of no circuit that has denied the viability of this defense.

Thus, outrageous conduct is a viable defense.[3] However, we conclude as a matter of law that the government's conduct in its investigation of Mosley was not sufficiently outrageous to provide Mosley with a defense to this prosecution. Accord-

2. It has alternatively been suggested that the outrageous conduct defense might rest upon the equitable supervisory power of the courts. *See Hampton v. United States,* 425 U.S. 484, 500 n. 4, 96 S.Ct. 1646, 1655 n. 4, 48 L.Ed.2d 113 (1976) (Brennan, J., dissenting). Because Mosley raises this defense under the Due Process Clause, we treat this defense as constitutional.

3. The district court, in refusing to grant a jury instruction on outrageous conduct, stated, "I am not convinced that outrageous conduct is a defense in a criminal case." R., Vol. VII, at 85. However, in light of its earlier denial of Mosley's motion to dismiss for outrageous conduct on the merits, R., Vol. VI, at 54–55, it is probable that the court's later statement was directed solely at the propriety of submitting the defense to the jury as an affirmative defense. The district court correctly refused to submit the defense to the jury. Outrageous conduct may be the basis for a motion to dismiss to be presented to the court; it is not an affirmative defense to be presented to the jury. *See Hampton,* 425 U.S. at 497, 96 S.Ct. at 1653–54 (Brennan, J., dissenting); *United States v. Salazar,* 720 F.2d 1482, 1488 (10th Cir.1983) ("[I]t is well settled that this question [outrageous conduct] is for the court to decide."), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985). Hence, it was not error for the district court to refuse to grant Mosley's requested jury instruction on outrageous conduct.

ingly, we affirm the district court's denial of Mosley's motions to dismiss for outrageous conduct.

**B.  The standard for outrageous conduct**

No federal court has defined the requirements of the outrageous conduct defense with any degree of precision.[4]  Rather, the inquiry appears to revolve around the totality of the circumstances in any given case. *See United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir.) ("Ultimately, every [outrageous conduct] case must be resolved on its own particular facts."), *vacated in part on other grounds sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir.1986).  However, as the name of the defense implies, to warrant dismissal of an indictment, the government's conduct with respect to that indictment must be outrageous.  Outrageousness must be determined by reference to " 'the universal sense of justice.' "  *See Russell*, 411 U.S. at 432, 93 S.Ct. at 1643 (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960)).

■  Although the requirement of outrageousness has been stated in several different ways by various courts, the thrust of each of these formulations is that the challenged conduct must be shocking, outrageous, and clearly intolerable.  *See, e.g., Russell*, 411 U.S. at 432, 93 S.Ct. at 1643 (conduct must violate " 'fundamental fairness' " or " 'shock[ ] the universal sense of justice,' ") (quoting *Kinsella*, 361 U.S. at 246, 80 S.Ct. at 304); *Nichols*, 877 F.2d at 827 (conduct must be "shocking and outrageous and reach[ ] an 'intolerable level' ") (quoting *Russell*, 411 U.S. at 431–32, 93

S.Ct. at 1643);  *United States v. Ryan*, 548 F.2d 782, 789 (9th Cir.) (conduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice"), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976), and *cert. denied*, 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977).

The cases make it clear that this is an extraordinary defense reserved for only the most egregious circumstances.  It is not to be invoked "each time the government acts deceptively or participates in a crime that it is investigating.  Nor is it intended merely as a device to circumvent the predisposition test in the entrapment defense.  *See United States v. Warren*, 747 F.2d 1339, 1341–42 (10th Cir.1984) ("The outrageous governmental conduct defense is manifestly reserved for only 'the most intolerable government conduct,' ") (quoting *Jannotti*, 673 F.2d at 608); *Ryan*, 548 F.2d at 789 ("the due process channel which *Russell* kept open is a most narrow one").

Government agents often need to play the role of criminals in order to apprehend criminals, and this role occasionally entails unseemly behavior.  Wide latitude is accorded the government to determine how best to fight crime.  *See Russell*, 411 U.S. at 435, 93 S.Ct. at 1644 (noting danger of "giv[ing] the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve"); *see also United States v. Esch*, 832 F.2d 531, 539 (10th Cir.1987), *cert. denied*, 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242 and *cert. denied*, 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988).

---

4.  The New York Court of Appeals suggested four factors that it deemed relevant to a determination of whether the government violated a defendant's (state constitutional) due process rights: (1) the government's role in creating the crime; (2) the illegality or immorality of the police conduct; (3) the defendant's reluctance or lack of predisposition to commit the crime; and (4) whether the investigation was designed to prevent further crime. *People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78, 83 (1978).  Our analysis below largely encompasses these factors.  However, because our analysis extends beyond these four factors, we decline to

adopt the *Isaacson* test, even though some federal courts have noted and even applied that test. *See, e.g., United States v. Bogart*, 783 F.2d 1428, 1435 n. 7 (9th Cir.) (noting but not applying *Isaacson* test), *vacated in part on other grounds sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir.1986); *United States v. Gardner*, 658 F.Supp. 1573, 1576–77 (W.D.Pa.1987) (applying *Isaacson* test but attributing it to *Bogart* ).  In fact, *Isaacson* itself admonished that its four specified criteria "should be viewed in combination with all pertinent aspects and in the context of proper law enforcement objectives...." 378 N.E.2d at 83.

The stringent nature of the test is demonstrated by the fact that although the defense has been raised many times, in only a small handful of those cases has the government's conduct actually been held to be outrageous. *See Gamble*, 737 F.2d at 857 (The outrageous conduct defense "is often raised but is almost never successful."). *Compare Warren*, 747 F.2d at 1342–43 & nn. 7–8 (listing numerous cases in which the outrageous conduct defense was rejected) *with United States v. Twigg*, 588 F.2d 373, 381 (3d Cir.1978) (upholding outrageous conduct defense); *United States v. Marshank*, 777 F.Supp. 1507, 1524 (N.D.Cal.1991) (same); *Gardner*, 658 F.Supp. at 1577 (same); *United States v. Batres–Santolino*, 521 F.Supp. 744, 753 (N.D.Cal.1981) (same); *and Bogart*, 783 F.2d at 1438 (remanding for factfinding to determine whether government conduct was sufficiently outrageous to warrant dismissal); *United States v. Lard*, 734 F.2d 1290, 1296 (8th Cir.1984) (holding, as alternate ground for reversing conviction, that government conduct "approached" being sufficiently outrageous to sustain due process defense); *Greene v. United States*, 454 F.2d 783, 787 (9th Cir.1971) (reversing on ground of non-entrapment government conduct, although not using "outrageous conduct" label). *Cf. also United States v. Silva*, 180 F.Supp. 557, 559–60 (S.D.N.Y. 1959) (directing verdict for defendant on grounds of government conduct, although not using "outrageous conduct" label).

■ The cases on outrageous conduct suggest two factors that form the underpinnings for most cases where the outrageous conduct defense has been upheld: government creation of the crime and substantial coercion.[5]

### 1. Creation of the crime

One factor that has contributed to successful invocation of the outrageous conduct defense has been excessive government involvement in creating the prosecuted crime. Where the government essentially generates new crime for the purpose of prosecuting it or induces a defendant to become involved for the first time in certain criminal activity, as opposed to merely interposing itself in an ongoing criminal enterprise, such conduct has occasionally been held to be outrageous. *See Twigg*, 588 F.2d at 381 ("government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him"); *Gardner*, 658 F.Supp. at 1576 (crime "would not have occurred but for the Government's assistance in manufacturing" it); *Batres–Santolino*, 521 F.Supp. at 752 (government "went about putting persons into the business of crime for the first time"); *see also Greene*, 454 F.2d at 787 (government "involve[d] itself ... directly and continuously over ... a long period of time in the creation and maintenance of criminal operations"); *Silva*, 180 F.Supp. at 559–60 ("criminal conduct participated in by this defendant was the product of the creative activity of ... the Government informer").

■ Although no specific rule has been formulated to determine when the involvement of the government in a criminal enterprise becomes excessive, some general guidelines emerge. The government may not "engineer and direct the criminal enterprise from start to finish." *See United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983). However, it is not outrageous for the government to infiltrate an ongoing criminal enterprise. *See, e.g., Nichols*, 877 F.2d at 827. Similarly, it is not outrageous for the government to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity. *See, e.g., United States v. Cantwell*, 806 F.2d 1463, 1468–69 & n. 3 (10th Cir.1986).

■ In order to induce a suspect to repeat, continue, or expand criminal activity, the government can suggest the illegal ac-

---

5. These two factors are not necessarily exclusive. They appear to represent the primary contexts in which the defense has been successful to date, although other situations have arisen in which government conduct has been held to be outrageous. *See, e.g., Marshank*, 777 F.Supp. at 1524 (outrageous conduct where agents induced defendant's attorney to help investigate, interrogate, and arrest defendant).

tivity. *See U.S. v. Biswell*, 700 F.2d 1310 at 1313 (10th Cir.1983) (agent suggested selling food stamps). The government can provide supplies and expertise for the illegal activity. *See United States v. Belzer*, 743 F.2d 1213, 1218 (7th Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 781 (1985). Additionally, the government can act as both supplier and buyer in sales of illegal goods. *See Hampton*, 425 U.S. at 485, 489–90, 96 S.Ct. at 1648, 1650.

### 2. Coercion

■ A second factor that has contributed to successful invocation of the outrageous conduct defense has been government coercion to induce the defendant to commit the crime. Coercive conduct short of physically forcing a defendant to commit a crime has been held outrageous. In *Bogart*, for example, the defendant alleged that government agents held him in jail for six months on trumped-up charges and on excessive bail; the only way that the defendant could raise funds sufficient to make bail was by agreeing to a cocaine transaction initiated by an undercover agent. 783 F.2d at 1430. The defendant argued that he was coerced in that he was effectively required to participate in a cocaine deal in order to gain his freedom from a wrongful and pretextual incarceration. The court held that those facts, if proved, would constitute outrageous conduct. *Id.* at 1431. *Cf. Silva*, 180 F.Supp. at 557 (entrapment as a matter of law where informer got defendant addicted to drugs and then offered defendant a "fix" only if he would deliver drugs).

Very large financial inducements by government agents have also amounted to sufficient affirmative coercion to contribute to an outrageous conduct holding. In *Batres–Santolino*, for example, one factor noted by the court in holding the government's conduct outrageous was that the defendants were offered the chance to invest their profits from a cocaine deal in "legitimate" businesses that promised "a fortune"; access to these deals, however, was contingent upon going through with the cocaine transaction. 521 F.Supp. at 749.

However, coercion of any type must be particularly egregious before it will sustain an outrageous conduct defense. "[G]overnment agents may employ appropriate artifice and deception in their investigation." *See Biswell*, 700 F.2d at 1314 (citation omitted). They may make "excessive offers." *See United States v. Lambinus*, 747 F.2d 592, 595 (10th Cir.1984), *cert. denied*, 471 U.S. 1067, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985). Agents may even utilize "threats or intimidation [if not] exceeding permissible bounds." *See Biswell*, 700 F.2d at 1314.

In summary, a defendant can raise the defense of outrageous conduct where the government was overly involved in the creation of the crime or where the government coerced him into participating in the crime. However, a high degree of government involvement or coercion is necessary before the defense will succeed.

### C. The outrageousness of Agent Arter's conduct

Mosley argues that the government's conduct in this case is outrageous under both of the factors discussed above. First, he argues that the government essentially created the crimes for which he is prosecuted. Second, he argues that several acts by Agent Arter effectively coerced him into participating in those crimes. We address each of these arguments in turn.[6]

### 1. Creation of the crime

■ Mosley argues that the government was so deeply involved in the crimes for which he is prosecuted that these crimes must be viewed as having been created by

---

**6.** Mosley raised his outrageous conduct defense in motions for dismissal prior to trial and in a motion for acquittal at the close of the government's case. He did not renew any of these motions at the close of his presentation of evidence. Accordingly, we limit the record for Mosley's outrageous conduct arguments to that portion prior to his motion to acquit at the close of the government's case, as that is the record which was before the district court at the time it decided his final motion.

the government. Thus, he argues, the government's conduct was outrageous. We disagree.

As discussed above, the determination whether the police created a crime for purposes of prosecution, as opposed to merely having encouraged a continuation or extension of prior crime, turns on the connection between the crime prosecuted and the defendant's prior conduct. Mosley has distributed cocaine on at least one occasion prior to the instant offense,[7] and it is also undisputed that Mosley bought cocaine prior to the instant offense. With regard to the instant offense it was Mosley that approached Agent Arter for the purpose of buying marijuana; Mosley indicated to Agent Arter that he had dealt substantial quantities of marijuana in the past; Mosley had several days to decide voluntarily whether to accept Arter's offer to buy cocaine and he accepted the fronting arrangement which allowed him five days to pay for half of the cocaine. We cannot say on these facts that the government so created the crime as to support an outrageous conduct defense.

### 2. Coercion

Mosley also argues that several aspects of Agent Arter's conduct during the investigation were coercive and thus outrageous. First, Mosley argues that Arter offered to sell him the cocaine at a price that was so low as to constitute coercion. Second, Mosley argues that Arter coerced him into the drug deal by exploiting his severe addiction to cocaine. Third, Mosley argues that Arter coerced him into buying cocaine instead of marijuana and into buying eight ounces of cocaine instead of four ounces. Fourth, Mosley argues that Arter caused a barmaid to telephone him and coerce him into completing the drug deal. Finally, Mosley argues that Arter coerced him into carrying a gun during the drug deal by showing him his own gun after Mosley frisked him. We address each of these acts in turn, concluding that none of

them, nor all of them taken together, constitute coercion sufficient to establish outrageous conduct.

#### a. Price

The allegedly low price at which Arter offered cocaine to Mosley does not constitute outrageous conduct. It is not clear from the record that the price was shockingly cheap. Mosley emphasizes Arter's testimony that an ounce of cocaine sells in Wheatland for an average of $1500. R., Vol. II, at 30. However, Arter later noted that

> as you move up, as you buy in volume, you obviously get a dealer's discount as they do. A pound of cocaine could go from anywhere from probably $7,000 to as much as probably $12,000. Again, depending on the area you are talking about, depending on whether the split is there, whether it's been dry for a while and how many times you dealt with an individual in the past.

R., Vol. IV, at 89.-90. Another DCI agent testified that he knew of a person who bought four ounces from a man in Colorado for $4,000 (or $1,000 an ounce). R., Vol. V, at 181. There was no testimony on the market price for quarter- or half-pound quantities in Wheatland at the time and under the circumstances of Arter's offer. However, from the testimony on the price for other quantities, it does not seem that a price of $3,200 for four ounces in an eight ounce transaction is such an attractive price as to amount to outrageous coercion. *Cf. United States v. Martinez*, 749 F.2d 601, 604–05 (10th Cir.1984) (not outrageous for police to offer food stamps to allegedly poverty-level defendant at 40% of face value); *United States v. Salazar*, 720 F.2d 1482, 1483, 1488 (10th Cir.1983) (offer of food stamps at 49% of face value not outrageous), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985); *cf. also Lambinus*, 747 F.2d at 595–96 (allegedly "ridiculously excessive offers" to trade

---

**7.** Admittedly, the only cocaine sale in the record is not strong evidence that Mosley regularly distributed cocaine, much less large quantities of cocaine. In that particular transaction, Mos-ley sold an eighth of an ounce of cocaine to a buyer who could remember buying cocaine from Mosley only once. *Id.*

merchandise for food stamps, in addition to repeated solicitation of the defendant and failure to follow USDA regulations for food stamp investigation, not outrageous).

### b. Addiction

█ During oral argument on appeal, Mosley's counsel suggested that Mosley's drug addiction should be considered as a factor in his claim that he was coerced to participate in the drug transaction with Arter.[8] It is argued that Mosley's addiction rendered him unable to resist the deal Arter offered to him. However, Mosley did not argue addiction to the district court as a basis for his motions to dismiss for outrageous conduct, nor was any evidence of addiction presented to the district court prior to the court's denial of his final motion to dismiss for outrageous conduct. Thus, we cannot conclude that the district court erred by denying Mosley's motions notwithstanding his addiction.

Further, even if we were to consider the evidence of Mosley's addiction that was offered subsequent to his final outrageous conduct motion, we would not come out differently. At no point in the proceeding was proof offered that the government knew of, much less took advantage of, Mosley's addiction. The mere fact that Mosley was addicted to cocaine would not give him immunity from prosecution.

### c. "Ratcheting up" the severity of the transaction

█ Mosley next argues that Arter coerced him into buying cocaine instead of marijuana and into buying eight instead of four ounces of cocaine. Thus, Mosley argues, Arter "ratcheted up" the severity of the transaction for purposes of sentencing, and possibly for the purpose of selling Mosley an amount that would indicate intent to distribute as opposed to mere personal use. We certainly do not condone such "ratcheting" tactics. However, we find no evidence that Arter coerced Mosley into buying cocaine instead of marijuana or into buying eight ounces instead of four ounces of co-

caine. Refusing to sell Mosley marijuana and offering only cocaine cannot be seen as coercing Mosley into buying cocaine. And offering to front an additional four ounces of cocaine cannot be seen as sufficiently coercive to sustain an outrageous conduct defense.

### d. The barmaid

█ Mosley next argues that Arter's conduct was coercive in that Arter had a barmaid at the Commodore, who was friendly with Mosley, call Mosley and ask him to keep an appointment with Arter. However, the record shows that this call was not sufficiently coercive to constitute outrageous conduct.

█ Mosley also argues that Arter's adulterous affair with the barmaid constituted outrageous conduct. However, this conduct did not affect Mosley. We have held that a defendant may not ordinarily assert an outrageous conduct defense based on conduct that harms third parties. *See Gamble*, 737 F.2d at 858–59. We see no reason to depart from that rule here.

### e. The gun

█ Mosley's final argument about coercion is that Arter induced him to carry a gun during the commission of the drug offense for the purpose of enhancing his sentence pursuant to 18 U.S.C. § 924(c). Mosley contends that he felt the need to carry a gun during the drug transaction, for reasons of safety and/or respectability, after he patted Arter down during an earlier meeting and found that Arter was carrying a gun. The choice to carry the gun was entirely Mosley's, and there was nothing improperly coercive about Arter's conduct in this regard.

In summary, the government has displayed excessive zeal in investigating Mosley's illegal drug activities. We do not condone such conduct and the government would do well to remember the admonition of Justice Brandeis in his dissent in *Olm-*

---

**8.** This argument does not clearly appear in his brief and was only addressed explicitly at oral argument.

*stead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), *majority opinion overruled on other grounds by Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967):

> Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means ... would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

*Id.* 277 U.S. at 485, 48 S.Ct. at 575. However, notwithstanding our disapproval of the government's conduct here, the defense of outrageous conduct is narrow and we must hold that the government's conduct in its investigation of Mosley was not so outrageous as to bar prosecution.

## II. Constructive Amendment of the Indictment

Mosley next requests a retrial on the ground that the district court effectively amended, or varied, his indictment by adding a definition of the word "fronting." The parties agree that "fronting" denotes a credit arrangement whereby a drug buyer is given drugs in exchange for a promise to pay for them at some later date. According to Mosley, "fronting" does not necessarily imply distribution. That is, although a person to whom drugs have been fronted will generally sell at least some of those drugs in order to pay his debt, he may use all of the drugs personally (presumably intending either to evade his creditor or to come up with the money to satisfy his debt through other means). The court, however, in defining "fronting" suggested that "the fellow who buys the drugs [on credit], apparently, resells it and then out of the proceeds, repays the purchase price." R.,

Vol. IV, at 22. Mosley immediately objected and moved for a mistrial.[9]

■ Mosley is correct that the Fifth Amendment forbids amendment of an indictment by the court, whether actual or constructive. The Fifth Amendment states that "[n]o person shall be held to answer for a[n] ... infamous crime, unless on a presentment or indictment of a Grand Jury...." U.S. Const. amend V. In *Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), *overruled on other grounds by United States v. Miller*, 471 U.S. 130, 142–44, 105 S.Ct. 1811, 1818–19, 85 L.Ed.2d 99 (1985), the Supreme Court held that a court cannot change the charging part of an indictment without violating the Fifth Amendment. *See id.* at 10, 7 S.Ct. at 786. In *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the Court made it clear that *Bain*'s prohibition applies even where the alleged amendment to the indictment is informal or constructive rather than formal. *See id.* at 217, 80 S.Ct. at 273.

However, the constitutional rule does not prohibit all amendments of an indictment by the court. Rather, the rule is only concerned with amendments that effectively subject a defendant to the risk of conviction for an offense that was not originally charged in the indictment. We have noted that

> [b]ecause the doctrine of constructive amendment ensures that a defendant's jeopardy is limited to those offenses presented to and returned by a grand jury, the trial court constructively amends the indictment if it ... creates "a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment."

*United States v. Apodaca*, 843 F.2d 421, 428 (10th Cir.) (quoting *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir.

9. The government argues that Mosley's failure to refer to the doctrine prohibiting constructive amendment of an indictment in his motion for a mistrial amounts to a waiver of any objection based on that doctrine. The record demonstrates that the objection raised by Mosley was broad enough to preserve this issue for appeal.

1986)), *cert. denied,* 488 U.S. 932, 109 S.Ct. 325, 102 L.Ed.2d 342 (1988).[10]

■ Even assuming that Mosley's definition of "fronting" is correct, the erroneous definition advanced by the district court did not expand the scope of the indictment or expose Mosley to charges that were not in the original indictment. Thus, the district court did not unconstitutionally amend the indictment and properly denied Mosley's motion for a mistrial.

### III. Departure Below the Sentencing Guidelines

Mosley argues that the sentencing judge erred by concluding that he could not depart below the minimum sentence mandated for carrying a firearm during the commission of a drug crime. *See* 18 U.S.C. § 924(c)(1). The judge clearly viewed the minimum as unduly harsh in Mosley's case and saw himself as having no discretion to depart below it. *See* R., Vol. VIII, at 16–20. Mosley directs our attention to *United States v. Jefferson,* 925 F.2d 1242, 1259–60 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 238, 116 L.Ed.2d 194 and *cert. denied,* — U.S. —, 112 S.Ct. 239, 116 L.Ed.2d 194 (1991), where we held that it was an abuse of discretion where a judge had discretion to depart below a Guidelines sentence and desired to do so but believed he lacked such discretion.

■ Here, however, the minimum sentence in the case at bar is statutory rather than a product of the Guidelines. The Guidelines specifically provide that "the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not

adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b). The statute under which Mosley was sentenced contains no such provision and we are aware of no authority for the proposition that a court can depart below a statutory minimum. Thus, we hold that the sentencing judge did not err in concluding that he lacked authority to depart below the statutory minimum sentence.

Accordingly, we AFFIRM the judgment and sentence below.

---

10. Mosley directs our attention to *United States v. Milestone,* 626 F.2d 264 (3d Cir.), *cert. denied,* 449 U.S. 920, 101 S.Ct. 319, 66 L.Ed.2d 148 (1980), which states that an alteration in an indictment is improper where it "tends to increase the defendant's burden at trial." *Id.* at 269. However, we do not read this statement in *Milestone* for the proposition that the Fifth Amendment prohibits a change in the indictment that increases the defendant's burden where the change poses no risk that the defendant might be convicted of an offense that was

not originally charged in the indictment. *Milestone* notes that the "increased burden" test serves to preserve "the notice function of the indictment." *Id.* Yet the notice function of an indictment is not impaired unless the defendant must defend against a charge that is not contained in the indictment. In fact, *Milestone* holds that no Fifth Amendment violation occurred in that case because the alleged amendment to the indictment did not "expand[ ] the issues the defendant was called upon to meet." *Id.*