35 F.3d 574
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Brent GUNDERSEN, Defendant-Appellant.
 No. 93-1057.
 United States Court of Appeals, Tenth Circuit.
 Sept. 13, 1994.
 
 Before BALDOCK, BARRETT and BRORBY, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 After examining the briefs and the appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R.App. P. 34(a); Tenth Cir. R. 34.1.9. The cause is therefore ordered submitted without oral argument.
 
 
 2
 Brent Gundersen (Gundersen) appeals from the judgment and sentence imposed following a jury trial. He was found guilty of one count of aiding and abetting securities fraud (18 U.S.C. 2 and 15 U.S.C. 78j(b) and 78(ff)), two counts of aiding and abetting mail fraud (18 U.S.C. 2 and 1341), and one count of aiding and abetting wire fraud (18 U.S.C. 2 and 1343).
 
 
 3
 During late 1988 and early 1989, the Federal Bureau of Investigation (FBI) and Securities and Exchange Commission (SEC) developed a "sting" operation in Denver, Colorado, in an attempt to curb the growing fraud in the Rocky Mountain area penny stock market. The FBI created Monarch Investment Services and FBI Agent John Coffey posed as "John O'Kelly," Monarch's president. O'Kelly let it be known that he was in the market for a "boxed" public company.
 
 
 4
 Boxed companies are lawfully registered shell corporations with little or no value, controlled by an individual or small group of individuals who artificially manipulate the purchase and sale of its stock. Once the manipulators have received their profits by selling the worthless stock to the unsuspecting public, the value of the stock crashes to zero.
 
 
 5
 From January through March, 1989, Anthony Cavanaugh, a convicted felon, FBI informant, and a known entity in the Denver penny stock market, introduced O'Kelly to various people, including codefendant Steven Sneed. Sneed related that he could find a shell corporation and that he would help O'Kelly recruit stockbrokers and market-makers to assist with the scheme.
 
 
 6
 In April, 1989, Sneed and O'Kelly flew to Salt Lake City to meet with Gundersen, whom Sneed had learned about through codefendant Herman Graulich. After first expressing concern that O'Kelly and Sneed might be "the heat," and that "we have to be fairly careful, I mean that, being careful, you can't really put a lot of things in writing, to incriminate ourselves," (Appellee's Addendum, Vol. 1, Tab 1-4A at 22), Gundersen related that he had a company he could get in the pink sheets[2] and deliver 100% of the stock. Gundersen also explained the related services he could provide, including supporting financial statements, a listing in Standard & Poors, and an attorney's tradeability letter.
 
 
 7
 Gundersen agreed to provide O'Kelly a shell corporation named Androids for $40,000.00. Androids was a defunct Utah corporation without any assets. Gundersen worked with codefendants Michael Franks and Eldon Weber[3] and others to revive Androids by preparing the necessary corporate history, documenting the names of nominee shareholders, officers, and directors, and paying back taxes and reinstatement fees. Many of Gundersen's false stock certificates were in the names of local college students.
 
 
 8
 Gundersen also obtained a cooperating attorney's tradeability letter which indicated that the restricted shares of Androids had been held for the required holding period and had become free-trading public stock. In June, 1989, Gundersen sent O'Kelly a packet of Androids' corporate documents. During this time, the company's name was changed from Androids to Monarch Acquisitions, Inc. (Monarch).
 
 
 9
 In July, 1989, Gundersen told O'Kelly that Graulich and codefendant Sam Pandolfo would serve as market-makers for the stock or arrange for others to do so. Gundersen also completed a Form 15c 2-11 which he sent to Pandolfo. Pandolfo's firm in turn filed the form with the National Quotation Bureau (NQB). By filing the form with the NQB, Pandolfo's firm was identified as a market-maker for Monarch stock. Gundersen also approved Sneed's trading schedule for the stock.
 
 
 10
 On October 10, 1989, Sneed joined O'Kelly at the Monarch office where Sneed directed trading of the stock. By making five trades over a three-day period, the codefendants were successful in moving the price of the worthless Monarch stock from five cents a share to twelve cents a share. On October 13, 1989, the SEC, by prior arrangement, suspended trading in Monarch stock. After trading was suspended, Gundersen and Graulich told O'Kelly not to worry, that they should just stay low and that trading could be resumed in a few days. Gundersen also told O'Kelly, "We're all covered [and] ... I can provide ... any documents ... [t]hat they have questions about." (Appellee's Addendum, Vol. 2, Tab 1-67A at 4).
 
 
 11
 Gundersen was subsequently charged in a nine-count indictment with nine codefendants, including Sneed, Graulich, and Pandolfo. Prior to trial, Gundersen moved to dismiss the indictment on the grounds of outrageous governmental conduct. His motion was denied. He proceeded to trial with Sneed, Graulich, and Pandolfo. Gundersen defended on the basis of outrageous governmental conduct, arguing that government agents created, directed, and engineered the scheme from start to finish.
 
 
 12
 Following his conviction, Gundersen was sentenced to 24 months imprisonment followed by three years of supervised release. He was also fined $15,000 plus a special assessment.
 
 
 13
 On appeal, Gundersen contends that the trial court erred in denying his motion to dismiss the indictment and that the sentence imposed by the court was improper as a matter of law.
 
 I.
 
 14
 Gundersen contends that the district court erred in denying his motion to dismiss the indictment for outrageous governmental conduct. Both Gundersen and the government cite United States v. Mosley, 965 F.2d 906 (10th Cir.1992), in which we held that "[a]lthough the requirement of outrageousness has been stated in several different ways by various courts, the thrust of each of these formulations is that the challenged conduct must be shocking, outrageous, and clearly intolerable." 965 F.2d at 910.
 
 
 15
 In Mosely, we addressed the question of whether conduct by the Wyoming Division of Criminal Investigation (DCI) was so outrageous as to violate the defendant's due process rights and thus bar prosecution. There, the DCI, upon receiving complaints of drug trafficking from citizens in Wheatland, Wyoming, assigned Special Agent Mike Arter to conduct an undercover investigation in the area. As part of the investigation, Arter frequented the Commodore Bar in Wheatland posing as a high-stakes drug dealer in an attempt to draw the attention of anyone involved in drug trafficking in the area.
 
 
 16
 Three months into the investigation, defendant Mosley approached Arter and inquired if Arter could sell him some marijuana. Arter subsequently told Mosley that he could not sell him any marijuana, but he suggested that he could sell Mosley a pound of cocaine for a "good price" of $10,000. When Mosley indicated a desire to purchase a smaller quantity, Arter agreed to sell him four ounces of cocaine for $3,200 and four ounces on credit.
 
 
 17
 On appeal, we rejected Mosley's contentions that the government's conduct was outrageous because the government essentially created the crimes for which he was prosecuted and because several acts by Arter had effectively coerced him into participating in those crimes. We rejected Mosley's contentions and observed that the outrageous government conduct defense "is an extraordinary defense reserved for the most egregious circumstances," 965 F.2d at 910, and that "[i]t is not to be invoked each time the government acts deceptively or participates in a crime it is investigating." Id. We further observed, "[t]he cases on outrageous conduct suggest two factors that form the underpinnings for most cases where the outrageous conduct defense has been upheld: government creation of the crime and substantial coercion." Id. at 911.
 
 
 18
 Gundersen argues that application of Mosely's two-point criteria, government creation of the crime and substantial coercion, establish that the government engaged in outrageous conduct herein. Gundersen contends that: the government contacted him first; there was an absence of any ongoing criminal activity prior to the government's involvement; the government's involvement was substantial; the government created the crime; and but for the government's over-zealous pursuit to nab some people in the penny stock market who might be committing crimes, he would not have been convicted.
 
 
 19
 The government responds that Gundersen failed to establish that it engaged in outrageous conduct. The government reasons that it did not create any criminal activity; it developed the sting operation in an attempt to curb the growing fraud in the Rocky Mountain area penny stock market; the evidence established that Gundersen operated what can only be described as a shell factory; and Gundersen was the CEO of an assembly line manufacturing plant where shell companies were shaped, molded, formed, and sold from the shelf or tailored for the particular customer as ready vehicles for fraud. We agree.
 
 
 20
 The government presented evidence which established that it set up the "sting" operation to combat ongoing criminal behavior. The government also established that Gundersen was not coerced, that Gundersen provided O'Kelly with a company for a negotiated price of $40,000, Gundersen employed the services of some eight people in producing shell corporations, and Gundersen was fully aware of the unlawful nature of the proposed scheme.
 
 
 21
 Applying Mosely, we hold that the district court did not err in denying Gundersen's motion to dismiss the indictment predicated on outrageous government conduct.
 
 II.
 
 22
 Gundersen asserts that the court erred in sentencing him when, after determining that the correct loss level for the sting operation was zero, it nevertheless departed upward based on U.S.S.G. 2F 1.1 comment (n. 9) ("Dollar loss often does not fully capture the harmfulness and seriousness of the conduct. In such instances, an upward departure may be warranted.") Gundersen argues that even if there was justification for this departure, which he does not concede, that the court also failed to identify and set forth specific aggravating circumstances which were not taken into consideration by the Sentencing Commission in support of the departure.
 
 
 23
 The government responds that the court was authorized to depart upward and that the court set forth with sufficient specificity aggravating circumstances not adequately taken into consideration by the sentencing guidelines.
 
 
 24
 We review the district court's upward departure in three steps:
 
 
 25
 First, we determine whether the circumstances cited by the by the district court warrant a departure from the guidelines as a matter of law.... Second, we review the court's factual determinations underlying the asserted justifications for departure to determine if they are supported by the record.... Third, we determine whether the degree of departure is reasonable.
 
 
 26
 United States v. Tisdale, 7 F.3d 957, 961 (10th Cir.1993), cert. denied, --- U.S. ---- (1993).
 
 
 27
 Here, the district court relied on U.S.S.G. 2F1.1 comment (n. 9) for its upward departure. (R., Vol. 51 at 220). The court found that the upward departure was warranted here "to take into account the obvious differences in culpability from--between a teller who steals $500.00 or embezzles $500.00 from the cash drawer on one occasion and the conduct that these defendants stand convicted of." Id. at 221. Thereafter, the court departed upward "to a base level which reflects a loss figure based on the anticipated gain which each defendant negotiated for himself." Id. at 224.
 
 
 28
 Inasmuch as Gundersen had negotiated a fee of $40,000.00, his offense level went from an eleven to a fifteen, and his imprisonment range went from "8 months to 14 months" to "18 months to 24 months." We hold that the court did not err in departing upward and that the degree of departure was reasonable based on the "intricate [and] carefully executed scheme," (R., Vol. 51 at 221), and the "anticipated gain which each defendant negotiated for himself." Id. at 224.
 
 
 29
 AFFIRMED.
 
 
 
 *
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 The pink sheets are a daily publication of the National Quotation Bureau (NQB), a private company. Printed on pink paper, the pink sheets list penny stocks, their market-makers, and their price
 
 
 [3]
 Weber pled guilty to this securities fraud scheme, cooperated with the government, and testified at trial about Gundersen's creation of bogus shell companies