**Gloria VAN WINKLE, Petitioner,**

v.

**Leo TAYLOR, et al., Respondents.**

No. 95–3286–DES.

United States District Court,
D. Kansas.

May 7, 1998.

Benjamin C. Wood, Topeka, KS, for Petitioner.

Kevin C. Fletcher, United States Atty's Office, U.S. Post Office and Courthouse, Sioux City, IA, for Respondents.

## MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

This matter is before the court on a petition for writ of habeas corpus (Doc. 1) filed pursuant to 28 U.S.C. § 2254. Petitioner is serving a life sentence for possession of cocaine. The court finds that the papers filed by the parties and the state court record are sufficient to resolve this case. Accordingly, the court finds that no evidentiary hearing is required to decide petitioner's claims. For the reasons set forth below, petitioner's application for habeas corpus relief is denied.

## I. FACTUAL BACKGROUND

"A state court's determinations on the merits of a factual issue are entitled to a presumption of correctness on federal habeas review." *Demosthenes v. Baal*, 495 U.S. 731,

**1256**

734, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990); *Lafferty v. Cook*, 949 F.2d 1546, 1549 (10th Cir.1991). A federal court may not overturn such determinations unless it concludes that they are not "fairly supported by the record." *See* 28 U.S.C. § 2254(d)(8). The court is satisfied with the accuracy of the factual summary as set forth by the Kansas Supreme Court in *State v. Van Winkle*, 254 Kan. 214, 864 P.2d 729 (1993), and adopts that summary substantially as follows:

The State's witness, Rick Crowell, who was on parole for a theft conviction, was a paid confidential informant working for the Junction City Police Department. He had been living at the Rambler Motel about one month when Gloria Van Winkle moved into the motel. Crowell met Van Winkle the day she moved in and saw her frequently between the week she moved in and the date of her arrest. Crowell testified that he observed her smoke cocaine on a daily basis and would go with her when she would purchase it. When Crowell told Van Winkle he had dealt drugs in Texas, she expressed an interest in dealing drugs in Junction City.

Crowell called the police department and told his contact, Detective Jackson, that Van Winkle wanted to buy cocaine. This was the first time Crowell had mentioned Van Winkle's name to the police. Officer Robert Story testified that through other informants, whom he was unable to name, the police had been told Van Winkle was using drugs. Story said he knew Van Winkle and knew that she had previous drug-related convictions. The police were interested in Van Winkle because she was a repeat offender and they believed she was connected with major drug dealers.

Story directed Crowell to offer to sell Van Winkle an ounce of cocaine for $1,200. Crowell made the offer as directed, but Van Winkle told Crowell she could only afford 1/16 ounce for $150. The deal was set for 9 p.m. that day. Detective Homman, operating undercover, acted as a drug dealer that Crowell knew from Texas who was in town with cocaine to sell.

Van Winkle drove Crowell to meet Homman. Crowell introduced Van Winkle to Homman and Homman said, "I heard you're looking for party supplies." After Van Winkle explained she only had $44 of the purchase price, Homman agreed to spot her $6, and to forego the remaining $100 in exchange for a tattoo Crowell had done for a friend of Homman's. Homman showed Van Winkle the cocaine. She said it looked like cocaine she had seen earlier in the week in Junction City. Van Winkle mentioned she knew someone who could deal in larger amounts of cocaine. Van Winkle stated to Homman she had previously dealt cocaine in Wichita and if she had been given more notice, she could have set up other drug deals with Homman. Van Winkle placed the purchase money on the bed. Crowell picked it up and handed it to Homman. Crowell then picked up the cocaine and handed it to Van Winkle. Crowell and Van Winkle left.

After the deal had been consummated, Story gave the signal for the arrest of the defendant. As the officers approached Van Winkle in the hallway, she threw the cocaine down. The police searched her purse and car but did not find other drugs or drug paraphernalia. Story explained to Van Winkle she was facing a life sentence; then he offered her an opportunity to have the charges reduced or dismissed if she would become an informant and provide the police with information regarding either a significant person or a number of people who were involved in drugs. Although Van Winkle expressed a willingness to cooperate, Story became convinced she was not being truthful or reliable and terminated the discussion.

Although the meeting was to be auditorially monitored, there were problems with the monitoring equipment and Officer Story and Detective Jackson were able to hear only parts of the conversation. Story and Jackson did overhear Van Winkle's comment as to the similarity between the cocaine involved and other cocaine Van Winkle had seen in Junction City.

Van Winkle gave a different version of the events to the jury. She admitted that she had previous drug convictions and was recently released from prison, but denied using drugs since her release. She testified Crowell kept coming over to her motel room to ask for food, shampoo, soap, and rides. When Crowell came over the day of the

arrest, Van Winkle told him to leave her alone. After Van Winkle returned from dinner, Crowell came back to her room and asked her for a ride to his girlfriend's place. Crowell had Van Winkle drive to a motel. Van Winkle stated she initially refused to accompany Crowell to the motel room. He convinced her to go to the room. As they approached the motel room Crowell handed her a wad of money and asked her to count it. Inside the room, Crowell and Homman first talked about tattoos and then discussed drugs. She testified that she did not want to be there but "played along." After counting the money, she gave it back to Crowell. Van Winkle claimed she did not handle the drugs.

Van Winkle stated that after the police arrested her, they told her she would receive a life sentence unless she agreed to become an informant. On cross-examination, Van Winkle claimed Homman and Crowell were lying as to what went on inside the motel room. She admitted she may have told Homman the cocaine looked like other cocaine she had seen around Junction City.

The jury was instructed on the defense of entrapment and to carefully evaluate the credibility of Crowell as a confidential informant. The jury found Van Winkle guilty of possession of cocaine. The court sentenced her to life in prison because of her two prior cocaine possession convictions and placed her on five years' probation. The court later revoked her probation and reinstated the sentence.

## II. STANDARDS

A federal district court can entertain an application for a writ of habeas corpus only on the ground that the applicant is in custody in violation of the Constitution or law or treaties of the United States. 28 U.S.C. § 2254(a). Exhaustion of state court remedies on all claims presented for habeas corpus review is required. 28 U.S.C. § 2254(b).

## III. DISCUSSION

■ Petitioner contends the government's conduct in contriving the sale of illegal narcotics was so outrageous that it violated her due process rights. Therefore, she argues, her conviction should be set aside. Respondents contend that petitioner's argument is not cognizable on federal habeas review because it is based on disagreement over the Kansas Supreme Court's interpretation of Kansas law in State v. Van Winkle. Therefore, respondents contend, the federal district court is bound by the Kansas court's ruling since "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). The court agrees with respondents' statement of law, but believes respondents misconstrue the nature of petitioner's claim. Although petitioner disagrees with the Kansas Supreme Court's ruling in State v. Van Winkle, her claim is nonetheless founded on the alleged violation of her federal due process rights. Accordingly, petitioner's claim is properly addressed on federal habeas review. See Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States") (citations omitted).

■ The court thus turns to the question whether the State's conduct in contriving the narcotics sale was so outrageous that it violated petitioner's federal constitutional rights. "[A] defendant can raise the defense of outrageous conduct where the government was overly involved in the creation of the crime or where the government coerced him into participating in the crime." United States v. Mosley, 965 F.2d 906, 912 (10th Cir.1992). However, as the Tenth Circuit cautioned, it "is an extraordinary defense reserved for only the most egregious circumstances" and "it is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating." Id. at 910. Nor may it be used "merely as a device to circumvent the predisposition test in the entrapment defense." Id. (citation omitted).

■ Excessive government involvement in creating the prosecuted crime is an important factor in successfully invoking the outrageous conduct defense. Id. at 911. Petitioner contends the State instigated the crime and specifically targeted her by paying Crowell extra for cases involving cocaine and/or repeat offenders. Where the government induces a defendant to become involved for the

first time in certain criminal activity, such conduct has occasionally been held to be outrageous. *Id.* (citing *United States v. Twigg,* 588 F.2d 373, 381 (3d Cir.1978)). In this case, however, the evidence shows that petitioner was not targeted until after she told Crowell she wanted to deal in drugs. Petitioner, therefore, and not the government, was the instigator of the crime. The evidence showing petitioner had engaged in criminal drug activity before the State's decision to target her further supports this finding as the Tenth Circuit has clearly stated "it is not outrageous for the government to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity." *Id.* (citing *United States v. Cantwell,* 806 F.2d 1463, 1468–69 & n. 3 (10th Cir.1986)).

■ Petitioner also suggests that the government became excessively involved by providing the cocaine, and by Crowell's conduct in picking up the money and cocaine and handing them to Homman and Van Winkle, respectively. This conduct, however, is also insufficient to establish excessive government involvement. The government is not prohibited from providing supplies and expertise for the illegal activity. *Id.* (citing *United States v. Belzer,* 743 F.2d 1213, 1218 (7th Cir.1984)). Nor is it prohibited from acting as a supplier in sales of illegal goods. *Id.* (citing *Hampton v. United States,* 425 U.S. 484, 485, 489–90, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976)). Merely supplying the cocaine and having a minor role in the mechanics of the actual sale is not enough to establish that the government "engineer[ed] and direct[ed] the criminal enterprise from start to finish." *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983).

■ Government coercion to induce the defendant to commit the crime is a another important factor that has contributed to successful invocation of the outrageous government conduct defense. *Id.* at 912. Petitioner suggests that the undercover agents offered to sell her the cocaine at a price that was so low as to constitute coercion. There is no evidence from the record, however, that the price was "shockingly cheap." *See id.* Petitioner also argues that the State coerced her into the drug deal by exploiting her addiction to cocaine. An es-

sential premise to this argument is petitioner's theory that predisposition to commit a crime does not bar the use of the defense of outrageous government conduct. In support of this theory, petitioner primarily relies on the *Hampton* case. Petitioner suggests that a majority of Justices left open the possibility that an outrageous conduct defense might be successfully invoked even if the entrapment defense is unavailable because of predisposition. 425 U.S. at 495, 96 S.Ct. 1646 (Powell, J., with Blackmun, J., concurring); *id.* at 496–97, 96 S.Ct. 1646 (Brennan, J., with Stewart & Marshall, JJ., dissenting).

■ The court agrees that the possibility remains open for the successful invocation of the outrageous conduct defense even in the face of a defendant's predisposition to commit a particular crime. The court need not decide this issue, however, since it is not persuaded that the government's alleged exploitation of petitioner's drug addiction amounts to outrageous conduct in violation of petitioner's rights to due process of law. *In United States v. Harris,* 997 F.2d 812 (10th Cir.1993), the Tenth Circuit declined to adopt a per se rule that a government agent's sale of narcotics to a known addict constitutes outrageous conduct since to do so would "severely inhibit" undercover operations. *Id.* at 817. For a government sale of narcotics to a known addict to constitute a violations of the defendant's due process rights, the circumstances must be especially egregious, such as where "law enforcement personnel rely on a known addiction to carry out multiple transactions with the primary purpose of stacking charges." *Id.* In this case, the government set up one sale to petitioner who was already buying cocaine from other sources. This is not the type of egregious conduct contemplated by the Tenth Circuit as inconsistent of due process. The court also notes that in this case there is no evidence in the record to establish that petitioner was actually addicted to cocaine, that is, that her use at the time of the "reverse sting" was anything other than voluntary.

■ The State's conduct in this case appears misguided and somewhat unfair. Nevertheless, in consideration of the totality of

circumstances, the court concludes that the State's conduct was not sufficiently shocking and outrageous to have violated petitioner's due process rights. Accordingly, petitioner's application for relief will be denied.

**IT IS THEREFORE BY THE COURT ORDERED** that petitioner's application for habeas corpus relief (Doc. 1) is denied.