OPINION
{¶ 1} Appellant, Carl P. Archibald, appeals from a jury verdict in the Lake County Court of Common Pleas in which he was found guilty of five counts of rape, two counts of kidnapping, and five counts of sexual battery in Case No. 2006-L-047. In that case appellant was also classified as a sexual predator pursuant to R.C. 2950.09(B)(3). Appellant appeals his conviction and sexual predator classification. Pursuant to State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, we vacate appellant's sentence and remand *Page 2 
for resentencing. For the reasons that follow, we affirm in part as to the jury verdict and appellant's sexual predator classification, and reverse in part as to appellant's sentencing only and remand.
 {¶ 2} This case was consolidated on appeal with Case No. 2006-L-207, in which appellant pled guilty to domestic violence. Appellant appeals his sentence only in that case. As a result of Foster, we also vacate appellant's sentence in this case and remand for sentencing. For the reasons stated in this opinion, we affirm in part as to appellant's guilty plea, reverse in part as to appellant's sentence, and remand.
 {¶ 3} In Case No. 2006-L-047, Christina Rusnak testified she is employed as a legal secretary in a medical malpractice law firm in the Cleveland area. She is the divorced mother of two young boys who reside with her at their home in Willowick, Ohio.
 {¶ 4} She was previously married to Tom Spishock from 2001 to 2004. During their marriage, she and her husband occasionally socialized with appellant and his wife Leigh Archibald. Appellant had been Spishock's close friend for years before Ms. Rusnak was married to him. She separated from Spishock in 2003. Due to Spishock's close relationship with appellant, she did not continue her friendship with the Archibalds after the separation. She did not hear from Leigh Archibald until December, 2004, when Leigh called her and the two women resumed their friendship, occasionally talking on the phone and meeting for dinner.
 {¶ 5} On April 29, 2005, at approximately 10:30 p.m., appellant called Ms. Rusnak's home. Her son answered the phone and told her that "Arch," as appellant was called, was on the phone asking for her. This was strange as she did not usually talk to appellant. Appellant was upset and said he and Leigh had been having marital problems and he needed to talk to someone. He asked her if she could meet and talk *Page 3 
with him for awhile. She felt sorry for him and said she could meet with him, but only for one-half hour.
 {¶ 6} She agreed to meet appellant at Leno's bar in Wickliffe. When she arrived, appellant was waiting in the parking lot sitting in his truck. He said he would buy her a beer, but she said she did not want one because she had recently had a cold and did not feel well. He said he was staying with friends a few houses down the street, and they could get soft drinks there. Appellant said he would drive her there and then bring her back to her car in one-half hour, and she agreed. Appellant drove to the friends' house.
 {¶ 7} Ms. Rusnak and appellant walked into the living room where there were two couches facing each other. Appellant brought her a pop from the kitchen and he had a beer. They sat on separate couches, and appellant started talking about his wife. He said Leigh had kicked him out two weeks earlier and was refusing to talk to him. As he talked about Leigh, appellant became increasingly irritated. About one-half hour later, Ms. Rusnak called her son on her cell phone and said she was leaving and would be home in five to ten minutes. Her other son was with her ex-husband for the weekend.
 {¶ 8} Appellant had gone in the kitchen while Ms. Rusnak was on the phone. He came back and sat on the couch next to her. He started rubbing her back and she told him to stop. She said she had to go and as she leaned for her purse, he took a pair of handcuffs out of his back pocket and put them on her right arm. Ms. Rusnak was struggling with appellant until he got hold of her left arm and handcuffed her in front. She was screaming and appellant told her to shut up and that he had a gun. He looked *Page 4 
over his shoulder and Ms. Rusnak saw there was a glass cabinet containing guns and a gun outside the cabinet leaning against the wall.
 {¶ 9} Appellant was screaming at Ms. Rusnak that she deserved this because it was her fault that Leigh was cheating on him. He said Ms. Rusnak knew the person Leigh was with, but Ms. Rusnak had no idea who he was talking about. She was crying and pleaded with him to let her go. He insisted she knew the person and that she should have called him and told him about it. While appellant was yelling at her, he took a white pill out of his front pocket and told her to take it. She was crying and said she did not want to take it. He was screaming at her and very angry. Ms. Rusnak was afraid he was going to kill her so she took it and put it under her tongue. He told her to open her mouth and he stuck his finger inside and took the pill out of her mouth. He then physically put it down her throat with his finger. He then made her take a second pill.
 {¶ 10} While appellant was still ranting about his wife, he took Ms. Rusnak by the handcuffs, saying they were going "to do lines," and dragged her into the bedroom.
 {¶ 11} There were two dressers in the bedroom, a tall one and a low one. He opened the drawer of the low dresser and took out a baggy which had white powder in it. He took a pen cover and scooped some out and told her to "do it." She said she did not want to. Ms. Rusnak assumed but was not certain this was cocaine. He held it up to her nose and held her nostril shut. He screamed at her to do it, and she did because she thought if she did not, he would kill her. Appellant had her ingest the powder three to four times and he also ingested it repeatedly. *Page 5 
 {¶ 12} Appellant then took out from one of the drawers a "masturbation sleeve" wrapped in a paper towel. He yelled at her to touch it and she said, "I'm not touching it." He then put it back in the drawer.
 {¶ 13} In an effort to get away from appellant, Ms. Rusnak told him she had to use the bathroom. She said she could not go with handcuffs on and he took them off. He walked her to the bathroom, which was off the living room; took the handcuffs off; and let her go in.
 {¶ 14} While in the bathroom, Ms. Rusnak was in a panic. After she ingested the powder, her heart was beating rapidly and she could not concentrate. While she was on the toilet, appellant opened the door and took a photograph of her with his cell phone camera.
 {¶ 15} Ms. Rusnak yelled "stop" and jumped up and pulled up her pants. She decided she was going to try to push him and run out. As she came out of the bathroom, appellant grabbed her hands and they struggled. He handcuffed her behind her back and took her back in the bedroom. He unfastened her jeans and started to pull them down. He unhandcuffed her and told her to take off her clothes or he would. She did not struggle anymore because, she testified, she could not overpower him. He took off his clothes while yelling at her to take hers off. She took off her sweat shirt and jeans, and he handcuffed her from behind while she was naked. He then took a picture of her while yelling at her to smile, but she did not smile.
 {¶ 16} Ms. Rusnak testified appellant made her stand by the low dresser and took a picture of her while she was naked. He put his hand on her shoulder and pushed her down to her knees and yelled at her to open her mouth. He was trying to put his penis in her mouth. Ms. Rusnak thought if she did not comply, he would kill her, and *Page 6 
appellant put his penis in her mouth. Appellant then took a picture of her with his penis in her mouth. He said he was going to show the pictures to his wife to get back at her for cheating on him because he said it would upset her that he cheated on her with one of her friends.
 {¶ 17} Appellant put the camera on the dresser, then grabbed her by her arms and lifted her up. He walked her backward toward the bed and pushed her on it while her hands were handcuffed behind her back.
 {¶ 18} He went into a drawer and took out a jar and scooped some cream out with his hand and wiped it on her vagina. It smelled of mint and burned. Ms. Rusnak testified she believed appellant was going to rape her so she asked him if he would use a condom. He said no, he was going to make her have his baby.
 {¶ 19} When he was spreading the cream on Ms. Rusnak, he kissed her mouth and yelled at her to kiss him, but she would not. He then kissed her breasts. Appellant stuck his fingers in her vagina, then pulled them out and wiped them across her mouth, asking her if she "liked the taste of pussy."
 {¶ 20} He then got on top of Ms. Rusnak and put his penis in her vagina. She asked him to stop because the handcuffs were digging into her back. He rolled her over and put his penis in her anus twice. She screamed for him to stop, and he told her if she would shut up and relax, it would not hurt so much. She kept pleading with him to stop and he rolled her over and put his penis back in her vagina until he ejaculated. He got off Ms. Rusnak, then picked up a t-shirt from the floor and wiped himself off, saying "look what you did." Ms. Rusnak was laying on the bed crying and still handcuffed. *Page 7 
 {¶ 21} Appellant said he was tired and had to be at work by 5:30 a.m. He picked up her clothes and threw them at her. He pulled her up so she could sit up. He took the handcuffs off and told her to get dressed while he dressed.
 {¶ 22} She picked up her purse, and appellant walked her to his truck. He put her in the truck, and while driving to her car he said, "this never happened." He said he was going to do the same thing to his wife and that he would do this to Ms. Rusnak again. He said that she could not tell anyone, and that because he had drugged her, no one would believe her.
 {¶ 23} When they arrived at her car, she got out of the truck and got in her car. Her clock indicated it was 2:48 a.m., so she had been with appellant three hours.
 {¶ 24} She was going to drive directly to the police station until she thought appellant might go to her home and try to harm her son so she decided to go there first. She called him on her cell phone, but he did not answer, so she left a message not to open the door for anyone.
 {¶ 25} When she arrived at her home, she ran in the house and opened her son's bedroom door and found he was sleeping. She called the police and reported she had been raped. The police responded, and after Ms. Rusnak made arrangements for her mother to take her son, she was taken to Lake West Hospital where a rape kit was performed.
 {¶ 26} Ms. Rusnak asked the nurse to do toxicology testing because she did not know what drugs appellant had given her. She also asked for and received a "morning after" pill.
 {¶ 27} Officer David Krivacic of the Wickliffe Police Department testified he was dispatched to Ms. Rusnak's home on April 30, 2005 at 3:15 a.m. on a sexual assault *Page 8 
call. He interviewed Ms. Rusnak who, he testified, was very upset, crying, and visibly shaking. She said she wanted to be examined at the hospital. He took photographs of red marks and swelling on both her wrists, which she said were from the handcuffs. She had red marks and scratches on the small of her back, which she said was from being handcuffed from behind.
 {¶ 28} Pamela Esposito testified she is employed as a nurse at Lake West Hospital in the emergency room. She said that when Ms. Rusnak came to the emergency room, she was upset and crying. She reported there had been oral, vaginal, and rectal penetration with the penis and digital penetration of her vagina. She said appellant used a cream that smelled of mint. Nurse Esposito saw redness and swelling on both wrists and scratches, abrasions, and redness on the buttocks on both sides. Ms. Rusnak reported being threatened with a gun and handcuffed and forced to take drugs and inhale powder. She reported appellant took pictures of her going to the bathroom and performing oral sex on him. Nurse Esposito performed a rape kit on Ms. Rusnak. The emergency room doctor performed a pelvic exam with a speculum, and they cleaned her abrasions. Nurse Esposito said Ms. Rusnak asked for a pill to avoid pregnancy and for a drug screen which hospital staff failed to perform.
 {¶ 29} Detective Donald Dondrea of the Wickliffe Police Department testified that following Ms. Rusnak's report, they obtained a search warrant to search appellant's residence. They found a glass cabinet which contained guns inside and a rifle outside the cabinet. They opened a dresser drawer in the bedroom and found the masturbation sleeve and the jar of cream Ms. Rusnak had mentioned. The jar indicated it was "prolonging cream." *Page 9 
 {¶ 30} Detective Walsh testified that appellant was arrested. The detective saw a cell phone camera on appellant's person and he took it as evidence. After advising appellant of his Miranda rights, the detective interviewed him after appellant said he wanted to talk to him. Walsh advised appellant that a complaint for rape had been filed against him. Appellant said it was not rape; they just slept together. He said they met at Leno's and he had her get in his truck. He said they were talking about problems he was having with his wife when they suddenly decided to have sex.
 {¶ 31} The detective asked appellant what kind of sex they had, vaginal, oral, or anal, and appellant only said vaginal. Detective Walsh said she claimed he forced her to have oral and anal sex. He said the oral sex was voluntary and the anal sex was accidental as he was behind her when she was "down on all fours." The detective asked him why he did not mention that the sex they had included oral and anal, and appellant said, "I don't know."
 {¶ 32} Detective Walsh asked him why he used handcuffs and he said he only used them during their foreplay and insisted he did not use them during sex. Appellant said he initially handcuffed her on the couch. The detective said, if she was not restrained, where did the marks on her back come from, and appellant said, "I don't know." He said his handcuffs had belonged to his brother-in-law who was a retired Cleveland police officer who had left them at his residence. He said he found them a few months earlier, then put them in the console of his truck. After appellant drove Ms. Rusnak to his residence, he said he took the handcuffs out of the console, but she did not see them then or know he had them.
 {¶ 33} The detective asked where the cuffs are now, and appellant said, "I can't tell you." The detective asked, why not, and appellant said, "I can't tell you." He asked *Page 10 
appellant, where are they, and appellant said, "I don't want to see them again." The detective asked if appellant disposed of the handcuffs, and at first appellant said, yes, then he said, no.
 {¶ 34} Appellant admitted Ms. Rusnak asked if he would put on a condom, and appellant said he refused. The detective asked appellant if he used a prolonging cream, and appellant did not deny it. The detective asked if he showed her a masturbation device, and appellant said he did not remember.
 {¶ 35} Detective Walsh asked him why he took photographs and he said, "for fun." He also said he deleted them from his camera. Detective Walsh testified that, based on his investigation, once such photos are deleted on this phone, they cannot be retrieved.
 {¶ 36} Appellant said they both used cocaine. The detective asked what they used to ingest it, and appellant said they used a spoon. He asked appellant where it was, and he said he threw it out of his truck while driving.
 {¶ 37} Appellant was indicted on a twelve-count indictment for rape by fellatio, a felony of the first degree, in violation of R.C.2907.02(A)(2); rape by digital penetration, a felony of the first degree, in violation of R.C. 2907.02(A)(2); rape by vaginal intercourse, a felony of the first degree, in violation of R.C. 2907.02(A)(2); rape by anal intercourse, a felony of the first degree, in violation of R.C.2907.02(A)(2); rape by vaginal intercourse, a felony of the first degree, in violation of R.C. 2907.02(A)(2); kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(2); kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(4); sexual battery by fellatio, a felony of the third degree, in violation of R.C.2907.03(A)(1); sexual battery by digital penetration, a felony of the third degree, in violation of R.C. 2907.03(A)(1); sexual *Page 11 
battery by vaginal penetration, a felony of the third degree, in violation of R.C. 2907.03(A)(1); sexual battery by anal intercourse, a felony of the third degree, in violation of R.C. 2907.03(A)(1), and sexual battery by vaginal penetration, a felony of the third degree, in violation of R.C. 2907.03(A)(1). Appellant pled not guilty, and the case was presented to a jury which returned a verdict of guilty on all counts. The trial court sentenced appellant to nine years in prison on counts one through five, each to run concurrent, and four years on count six, to run consecutive to the nine years imposed on counts one through five. The court found that count seven merged with count six, and that counts eight through twelve merged with counts one through five. The court also determined that appellant was a sexual predator. This appeal follows. Appellant asserts the following assignments of error:
 {¶ 38} "[1] THE TRIAL COURT ERRED WHEN IT BARRED THE ADMISSION OF DEFENSE EVIDENCE UNDER OHIO'S RAPE SHIELD LAW IN VIOLATION OF THE DEFENDANT-APPELLANT'S RIGHTS TO DUE PROCESS AND FAIR TRIAL AND TO CONFRONT WITNESSES GUARANTEED UNDER THE FIFTH, SIXTH ANDFOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I
OF THE OHIO CONSTITUTION.
 {¶ 39} "[2] THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT WHEN IT RETURNED A VERDICT OF GUILTY AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 40} "[3.] THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT LABELED THE DEFENDANT-APPELLANT A SEXUAL PREDATOR AGAINST THE MANIFEST WEIGHT OF THEJ EVIDENCE. *Page 12 
 {¶ 41} "[4] THE TRIAL COURT ERRED WHEN IT SENTENCED THE DEFENDANT-APPELLANT TO A MORE-THAN-THE-MINIMUM, CONSECUTIVE SENTENCE BASED UPON A FINDING OF FACTORS NOT FOUND BY THE JURY OR ADMITTED BY THE DEFENDAND-APPELLANT IN VIOLATION OF THE DEFENDANT-APPELLANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO TRIAL BY JURY."
 {¶ 42} Under his first assignment of error, appellant argues that his constitutional rights to due process, fair trial and confrontation of witnesses were violated when, pursuant to the rape shield law, the court granted the state's motion in limine to prevent him from asking the victim whether she had previously gone to a "pure romance party." These are apparently parties held by women for their female friends at which they can purchase marital aids.
 {¶ 43} It must first be noted that appellant never made a proffer of any such evidence after the trial court granted the state's motion in limine to preserve the issue for appeal. It is well-settled that the court's grant of a motion in limine is merely a preliminary ruling on an evidentiary issue that is anticipated but not yet presented in its full context. A preliminary ruling does not have an affect until it is acted upon at trial. As a result, the proponent of the evidence must actually proffer that evidence during the trial to preserve the issue. Without such a proffer, an appellate court has nothing to rule on. State v.Chandathany, 9th Dist. No. 02CA0081-M, 2003-Ohio-1593, at ¶ 5.
 {¶ 44} Our review of the record reveals that there is no evidence, proffered or otherwise, concerning, e.g., whether the victim ever attended any such party, the purpose of her going to such party, or whether she ever bought or used any item sold at *Page 13 
such parties. As a result, appellant has failed to preserve for appeal any issue related to the victim's alleged attendance at such a party.
 {¶ 45} Next, we note that appellant never argued below that the exclusion of this "evidence" would violate his constitutional rights. The Ohio Supreme Court has held that a party's failure to raise in the trial court the constitutionality of a statute or of its application waives the issue where the issue was apparent at the time of trial, except in cases of plain error. State v. Arwan (1986),22 Ohio St.3d 120, syllabus; see, also, In re M.D. (1988), 38 Ohio St.3d 149, syllabus.
 {¶ 46} Appellant failed to assert his constitutional challenge below, and we do not discern anything about this case which could conceivably rise to the level of plain error. We therefore hold that appellant has waived any right to assert such challenge here.
 {¶ 47} Appellant argues he intended to introduce evidence of the victim's attendance at a pure romance party to show a pertinent trait of character of the victim under Evid.R. 404(A)(2), i.e., her fondness of "kinky" sex. Appellant argues that the victim's alleged attendance at one such party, where, he argues, handcuffs, prolonging cream, and masturbation sleeves are routinely sold, supported appellant's defense that their sex was consensual. Evid. Rule 404(A)(2) provides in part:
 {¶ 48} "Character of the victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused * * * is admissible; however, in prosecutions for rape * * *, the exceptions provided by statute enacted by the General Assembly are applicable."
 {¶ 49} Appellant argues that the rape shield law is an exception to Evid.R. 404(A)(2). The rape shield law is codified at R.C. 2907.02(D), and provides in pertinent part as follows: *Page 14 
 {¶ 50} "Evidence of specific instances of the victim's sexual activity * * * shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, the defendant's past sexual activity with the victim, or is admissible against the defendant under 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."
 {¶ 51} Appellant argues that the trial court erred in relying on R.C.2907.02(D) to exclude this cross-examination because the statute only excludes evidence of the victim's "sexual activity," which is defined at R.C. 2907.01(C) as "sexual conduct or sexual contact." "Sexual conduct" is defined at R.C. 2907.01(A) as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. * * *" "Sexual contact" is defined at R.C.2907.01(B) as "any touching of an erogenous zone of another * * *."
 {¶ 52} Appellant argues that the victim's alleged attendance at a pure romance party does not constitute sexual activity, and it is therefore not protected under the rape shield law. First, we note that other districts have held that "sexual activity" for purposes of the rape shield law is not limited to its statutory definition. In State v.Tomlinson (1986), 33 Ohio App.3d 278, the state sought to preclude appellant from questioning the victim who was a child concerning her prior behaviors of fondling herself, pulling up her dress for neighborhood boys, and her general behavior around males. The defendant argued this questioning was not prohibited by R.C. 2907.02(D) because the subject conduct was not technically "sexual conduct" or "sexual contact," the only types of *Page 15 
sexual activity prohibited by the statute. The court noted the purpose of the rape shield law was to protect the victim from harassment and to discourage the tendency in rape cases to try the victim rather than the defendant. The court held that R.C. 2907.02(D) prohibits evidence of the victim's prior sexual behavior, including behavior which did not fit the definition of "sexual conduct" or "sexual contact." The court "decline[d] to circumscribe the statute so narrowly as to permit the introduction of testimony which puts the victim on trial and which allows an attack on credibility beyond the scope of the rules of evidence. Id. at 280.
 {¶ 53} We find the holding of the Twelfth District inTomlinson, supra, to be persuasive.
 {¶ 54} We therefore hold that if appellant had preserved the issue for appeal, the evidence appellant hoped to elicit would have been protected from disclosure by the rape shield law.
 {¶ 55} However, even if that law did not apply, we fail to see how the victim's alleged attendance a pure romance party is evidence that the victim had a "proclivity for `kinky' sex." Further, we do not agree that if a person was fond of "kinky" sex, this affinity would be admissible to support a consent defense under Evid.R. 404. Further, each of the items appellant used during his rape of the victim belonged to him and not the victim. In fact, he told Det. Walsh his handcuffs belonged to his brother-in-law, and that the victim did not know he had taken them from the console of his truck and into the house. As a result, none of the items appellant used can be attributed to the victim. Further, there is no evidence that the victim ever purchased any such item. For this additional reason, appellant's proposed examination would have been irrelevant to his defense. We again note that without a record as to whether the victim ever went to *Page 16 
such a party, her purpose in attending, or whether she bought anything there or had any interest in the types of items referenced, the issue has not been preserved on appeal.
 {¶ 56} Appellant's reliance on State v. Williams (1986),21 Ohio St.3d 33 is misplaced because the victim there testified on direct that she did not have sex with men because she was gay. The Supreme Court held the defendant was permitted to present testimony that she was a prostitute to contradict her testimony. Here, the victim did not deny she ever used the items appellant enlisted to perpetrate his rape. The record does not disclose she was ever asked any questions concerning this issue. Thus, appellant may not rely on Williams to challenge the trial court's ruling.
 {¶ 57} Appellant's first assignment of error is without merit.
 {¶ 58} Under his second assignment of error, appellant argues the jury's verdict finding appellant guilty of all counts in the indictment was against the manifest weight of the evidence. We do not agree.
 {¶ 59} In determining whether the judgment is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of the witnesses. The court determines whether, in resolving conflicts in the evidence and deciding witness credibility, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 60} Witness credibility rests solely with the finder of fact, and an appellate court is not permitted to substitute its judgment for that of the jury. Arwan, supra, at 123. *Page 17 
 {¶ 61} The jury is entitled to believe all, part, or none of the testimony of any witness. State v. McDaniel, 10th Dist. No. 06AP-44,2006-Ohio-5298, at ¶ 3.
 {¶ 62} The role of the reviewing court is to engage in a limited weighing of the evidence in determining whether the state properly carried its burden of persuasion. Thompkins, supra, at 390. If the evidence is susceptible to more than one interpretation, an appellate court must interpret it in a manner consistent with the verdict.State v. Banks, 11th Dist. No. 2003-A-0118, 2005-Ohio-5286, at ¶ 33.
 {¶ 63} Appellant argues Ms. Rusnak's testimony was not credible because, according to her, it appears appellant planned the rape, and it seems unlikely he would begin his crime in such a public fashion. He argues it is incredible he would have begun his attack just after she called her son to say she would be home soon. However, it was logical to conclude this was the catalyst for the crime to begin because appellant then understood she intended to leave at that time. Moreover, given appellant's increasing irrational and accusatory behavior, it is reasonable to conclude he was not thinking about the consequence of the victim's calling her son at that time. In the circumstances presented, it was not unreasonable for the jury to believe, as it clearly did, that appellant began his attack at that time.
 {¶ 64} Appellant argues that because in the two weeks he lived at his friend's home, the homeowner would come and go all the time, it seems unlikely appellant would plan and carry out the rape when, he argues, the owner could walk in at any time. It must be remembered that this event occurred roughly between midnight and 3:00 a.m., and, even if appellant was not familiar with the homeowner's routine, it would be logical for him to presume she was out for the night. In fact, she testified she did not return until the next day. Given the level of rage and lack of control appellant exhibited *Page 18 
that night, it was reasonable for the jury to believe he acted out despite the possibility the owner could return. Or perhaps he thought he would hear the owner's vehicle long before she arrived so he could react accordingly. Since the owner was his friend who testified on his behalf in his rape trial, it would be logical for him to believe she would cover for him. These are issues known only to appellant. In any event, the jury was entitled to discredit the owner's entire testimony, since, given her relationship with appellant, she was biased in his favor.
 {¶ 65} Next, appellant claims that forcing the victim to take narcotics, taking photographs of the victim in degrading acts, and rubbing prolonging cream on the victim's vagina are more indicative of consensual sex than rape. To the contrary, forcing the victim to take drugs to inhibit her ability to resist and taking photos of her while forcing her to perform fellatio so he could, as he said, show them to his wife to hurt her for cheating on him are consistent with rape and inconsistent with a consensual relationship.
 {¶ 66} Appellant argues Ms. Rusnak's testimony about him threatening her with a gun is contradicted by the evidence because he never removed any guns from the cabinet. Appellant conveniently forgets that he told her he had a gun and then looked over his shoulder at the rifle leaning against the wall and the full gun cabinet. The victim did not know what type of gun he had or that the gun cabinet, according to appellant's friend, was allegedly locked. Based upon the record as a whole, the jury was entitled to believe that appellant, in saying he had a gun coupled with his glance at the gun cabinet, meant to threaten the victim.
 {¶ 67} Next, appellant argues that because the victim's ex-husband testified he had taught her martial arts and she once made a martial arts move toward him, it does *Page 19 
not make sense that Ms. Rusnak would not use the same technique on appellant if she felt she had been kidnapped. While the jury was entitled to completely discredit the ex-husband's testimony, there is a huge difference between making a martial arts move against one's husband in a non-threatening environment and making such a move where one has been kidnapped, handcuffed and forced to take narcotics. The victim here was in a panic and not able to concentrate due to the drugs. It is therefore unreasonable to expect her to use martial arts on appellant in order to find her testimony credible. Moreover, Ms. Rusnak had tried to struggle with appellant several times and each time he overpowered her. She finally stopped struggling when she became convinced that if she did not comply with his demands, he would kill her. It is important to consider the evidence in its entirety, not in limited excerpts. The jury considered this evidence and appellant's version, and obviously chose to believe the victim. Based upon this record, we cannot say the jury clearly lost its way or that its decision was against the manifest weight of the evidence.
 {¶ 68} Appellant argues it is unrealistic to believe that if Ms. Rusnak had been kidnapped, she would not have found hairspray in the bathroom and sprayed it in appellant's face; that she would not have found the owner's tool box in a closed drawer and used those tools against appellant; that she would not have jumped out of the bathroom window; or that she would not have yelled to neighbors outside. Considering the evidence as a whole, it must be noted that appellant had forcibly drugged Ms. Rusnak. In the circumstances, it is unrealistic to expect the victim would have taken the measures appellant now suggests. The jury obviously believed the victim and we cannot say it clearly lost its way in doing so. *Page 20 
 {¶ 69} Appellant argues that because the homeowner did not find anything disturbed when she returned to the house the next day, this militates against a struggle having taken place. Assuming the jury believed this testimony-which it was not required to do-appellant had quickly overpowered his victim and used narcotics and handcuffs to assist in that endeavor. Ms. Rusnak did not testify anything was broken in the struggle. Moreover, one would imagine that even appellant was capable of tidying up to cover his rape. After all, he admitted to the detective that he threw away the spoon he used for the cocaine and deleted the photos he had taken of his victim in degrading positions.
 {¶ 70} Appellant next speculates as to reasons Ms. Rusnak might "make up the rape allegations." For appellant to suggest she invented her rape to explain what he referred to as "slight marks and scratches" to her boyfriend makes no sense. It would have been far easier for her to simply wear a sweater and jeans to cover her injuries if that was her intent.
 {¶ 71} Appellant's suggestion that perhaps she was ashamed because she just had sex with her friend's husband and concocted her rape to cover this fact likewise makes no sense. If her interest was in concealing this information from appellant's wife, all she had to do was not disclose it.
 {¶ 72} The record reveals the victim gave an extremely detailed account of her ordeal immediately after it occurred, and throughout the proceedings never varied from her original statement. Moreover, the testimony of the officers and hospital personnel regarding her injuries, demeanor, and evidence found at the scene provided strong corroboration. In contrast, appellant was not forthright with Detective Walsh. He withheld information from the detective; refused to answer questions when he clearly knew the answers; and admitted to disposing of valuable evidence in the case. *Page 21 
 {¶ 73} Ms. Rusnak's testimony was clearly an issue in this case. Appellant's counsel cross-examined her extensively, and there is no reason to think the jury did not consider this testimony. After considering all the evidence, the jury chose to believe her version of the events. We cannot say it clearly lost its way in doing so. When observed as a whole, we believe the state presented ample, credible evidence that, if believed by the jury, established appellant's guilt beyond a reasonable doubt.
 {¶ 74} Appellant's second assignment of error is without merit.
 {¶ 75} Appellant's third assignment of error challenges the trial court's classification of appellant as a sexual predator. On February 27, 2006, the trial court conducted a sexual predator hearing pursuant to R.C. 2950.09, and determined that appellant should be classified as a sexual predator.
 {¶ 76} In reviewing a sexual predator determination, an appellate court reviews the determination under a civil manifest-weight-of-the-evidence standard, and may not disturb it when the judge's findings are supported by some competent, credible evidence.State v. Wilson, 113 Ohio St.3d 382, 2007-Ohio-2202, syllabus.
 {¶ 77} R.C. 2950.01(E) provides in part:
 {¶ 78} ?`Sexual predator' means a person to whom either of the following applies:
 {¶ 79} "(1) The person has been convicted of * * * a sexually oriented offense * * * and is likely to engage in the future in one or more sexually-oriented offenses. * * *"
 {¶ 80} The jury verdict finding appellant guilty of five counts of rape in the first degree satisfies the first prong of this "sexual predator" definition. R.C. 2950.01(D)(1). However, in order for one to be designated a sexual predator, the state must prove by "clear and convincing evidence" that the offender is likely to commit sexually oriented offenses in the future. R.C. 2950.01(E) "Clear and convincing evidence has been *Page 22 
defined as the amount of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations to be proved. It is more than a preponderance of the evidence and less than beyond a reasonable doubt. State v. Yodice, 11th Dist. No. 2001-L-155, 2002-Ohio-7344, at ¶ 13.
 {¶ 81} R.C. 2950.09(B)(3) sets forth specific factors to be considered by a trial court prior to making the determination that an offender is a sexual predator. R.C. 2950.09(B)(3) provides:
 {¶ 82} "* * * the judge shall consider all relevant factors, including, but not limited to, all of the following:
 {¶ 83} "(a) The offender's * * * age;
 {¶ 84} "(b) The offender's * * * prior criminal record * * * regarding all offenses, including, but not limited to, all sexual offenses;
 {¶ 85} "(c) The age of the victim of the sexually oriented offense for which sentence is to be imposed * * *;
 {¶ 86} "(d) Whether the sexually oriented offense for which sentence is to be imposed * * * involved multiple victims;
 {¶ 87} "(e) Whether the offender * * * used drugs or alcohol to impair the victim of the sexually oriented offense or to prevent the victim from resisting;
 {¶ 88} "(f) If the offender * * * previously has been convicted of or pleaded guilty to * * * a criminal offense, whether the offender * * * completed any sentence * * * imposed for the prior offense * * * and, if the prior offense * * * was a sex offense or a sexually oriented offense, whether the offender * * * participated in available programs for sexual offenders;
 {¶ 89} "(g) Any mental illness or mental disability of the offender * * *; *Page 23 
 {¶ 90} "(h) The nature of the offender's * * * sexual conduct, sexual contact, or interaction in a sexual context with the victim of the sexually oriented offense and whether the sexual conduct, sexual contact, or interaction in a sexual context was part of a demonstrated pattern of abuse;
 {¶ 91} "Whether the offender * * * during the commission of the sexually oriented offense for which sentence is to be imposed * * *, displayed cruelty or made one or more threats of cruelty;
 {¶ 92} "(j) Any additional behavioral characteristics that contribute to the offender's * * * conduct."
 {¶ 93} It is not necessary for a trial court to find all of said factors apply to an offender, or even a majority of the factors prior to the classification as a sexual predator. State v. Swank (Dec. 21, 2001), 11th Dist. No. 98-L-049, 2001-Ohio-8833, 2001 Ohio App. LEXIS 5846, *16; see, also, Yodice, supra.
 {¶ 94} "[T]he defendant may be so adjudicated even if only one or two of these factors are present, so long as the totality of the circumstances provide clear and convincing evidence that the defendant is likely to commit a sexually oriented offense in the future." Id.
 {¶ 95} The court psychologist Dr. Jeffrey Rindsberg testified appellant has a high probability of having a substance abuse disorder, but that appellant denied any serious drug or alcohol problem. Dr. Rindsberg noted appellant's history of violent offenses. He said that based on testing, appellant was in the moderate-low range of risk to recidivate. He said that during an episode of domestic violence against his wife, appellant told her to take off her clothes. Dr. Rindsberg said this suggests a sexual deviancy aspect to his behavior. *Page 24 
 {¶ 96} He said the fact appellant incapacitated the victim in the present case shows he planned this rape.
 {¶ 97} Dr. Rindsberg stated appellant is at least a moderate risk for sexual re-offending. However, the escalating nature of his offenses, his history of violence, his potential sexual problems, his deviant interests, his attack on an unrelated victim, and the planned nature of that attack increase his potential for engaging in another sexual offense. He recommended that the trial court classify appellant as a sexual predator.
The court reviewed the pre-sentence report, the victim impact statement, the psychological evaluation of Dr. Rindsberg, and the testimony of Dr. Rindsberg and Leigh Archibald. The court found, by clear and convincing evidence, appellant to be a sexual predator in that he had been convicted of a sexually oriented offense and is likely to engage in the future in one or more sexually oriented offenses.
 {¶ 98} In making this determination, the court made the following findings: (a) Appellant was thirty-six years old; (b) Appellant had a prior criminal record, including two prior domestic violence misdemeanor convictions plus an additional misdemeanor case for which he completed a diversion program, a felony domestic violence conviction from July, 2005, and two prior DU I convictions; (c) The victim of the sexually-oriented offense for which sentence was imposed was thirty-four years old; (d) The offense did not involve multiple victims; (e) Appellant used drugs to impair the victim or to prevent her from resisting; (f) Appellant was on probation for a prior domestic violence conviction at the time he committed these crimes and so did not successfully complete the sentence imposed for this prior conviction. Since he had not previously been convicted of a sex offense, he did not have occasion to participate in a program for sexual offenders; (g) Appellant has a mental illness or mental disability, i.e., alcohol *Page 25 
dependence, cocaine abuse, and personality disorder (paranoid and borderline traits). He has alcohol and drug abuse problems that have not been adequately addressed. He is paranoid, distrustful and obsessive; (h) Appellant's sexual conduct, sexual contact or interaction in a sexual context included "extreme violence, use of restraints, threatening behavior and forced ingestion of drugs;" (i) His actions during the offenses displayed cruelty or threats of cruelty, i.e., use of restraints, extreme violence, threatening behavior and forced ingestion of drugs; (j) Additional behavioral characteristics that contributed to his conduct included: (1) appellant's irrational cognitive style that allowed him to rape a woman unrelated to him who, to him, was related to his wife having an affair; (2) the victim was unrelated to appellant which increased the risk; (3) he has antisocial traits; (4) he has a history of violence; (5) his behavior reflects an escalation in the nature of his violence and his victims. His conduct has escalated from assaulting women to raping a woman, and the victims have escalated from his wife to an unrelated victim. He has a violent streak that he cannot control, and he is unable to control his impulses, especially when drinking and using drugs.
 {¶ 99} Appellant argues Dr. Rindsberg recommended that appellant be classified a sexual predator based on his incorrect conclusion that appellant forced his wife to undress during an incident of domestic violence against her. Appellant argues that he only asked her to undress after the violence was over so that it was not part of the assault. A review of the record does not support this argument as appellant slammed her into a wall and banged her head against the wall four times after he told her to take her clothes off. In any event, the doctor listed several reasons for his recommendation, and there is no reason to believe he placed any special emphasis on this factor. *Page 26 
Moreover, it is the court, not the psychologist, that makes the decision, and the court did not refer to this factor in rendering its decision.
 {¶ 100} We further do not agree with appellant's argument that because he now trusts his wife, it is far less likely that he will ever rape another woman. We are not willing to risk the safety of other women because of this recent revelation, which may be subject to change at anytime, especially if appellant happens to be abusing alcohol or drugs.
 {¶ 101} Appellant's third assignment of error is without merit.
 {¶ 102} Because they are related, we will consider appellant's fourth assignment of error in Case No. 2005-L-047 with his sole assignment of error in Case no. 2006-L-207. In the latter case appellant was indicted in a one-count indictment for domestic violence with a prior domestic violence conviction against his wife Leigh Archibald, a felony of the fourth degree, in violation of R.C. 2919.2(A). Appellant was sentenced for this offense to seventeen months, to run consecutive to his sentence in Case No. 2006-L-047.
 {¶ 103} Appellant was sentenced in both of the instant cases prior to the Supreme Court's release of its ruling in Foster, supra. In that case the Ohio Supreme Court held that those sections of Ohio's criminal sentencing law which require judicial fact-finding to be unconstitutional. The trial court imposed a more-than-the-minimum, consecutive sentence and in so doing applied R.C. 2929.14(B), R.C.2929.14(E)(4), and R.C. 2929.19(B)(2). Under Foster, these provisions are unconstitutional and appellant's right to a jury trial was violated. As a result, we hold that these assignments of error have merit and both cases must be remanded to the trial court for a new sentencing hearing pursuant to Foster. *Page 27 
 {¶ 104} Appellant's fourth assignment of error has merit.
 {¶ 105} For the reasons stated in the Opinion of this court, it is the judgment and order of this court that the judgments of the Lake County Court of Common Pleas in Case No. 2006-L-047 and in Case No. 2006-L-207 are affirmed in part; reversed in part, and the matters are remanded to the trial court for further proceedings consistent with this opinion.
DIANE V. GRENDELL, J., concurs,