[Cite as *State v. South*, 2017-Ohio-5636.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# GEAUGA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2016-G-0083** |
| CHAD SOUTH, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Geauga County Court of Common Pleas, Case No. 15 C 000116 A.

Judgment: Affirmed.

*James R. Flaiz*, Geauga County Prosecutor, and *Christopher J. Joyce*, Assistant Prosecutor, Courthouse Annex, 231 Main Street, Suite 3A, Chardon, OH 44024, and *Paul L. Scarsella*, Special Assistant Prosecutor, Ohio Attorney General's Office, 150 E. Gay Street, 16th Floor, Columbus, OH 43215 (For Plaintiff-Appellee).

*Timothy Young*, Ohio Public Defender, and *Francisco E. Luttecke*, Assistant Public Defender 250 East Broad Street, Suite 1400, Columbus, OH 43215-9308 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} Following a bench trial, appellant, Chad South, was found guilty of two counts of murder, two counts of kidnapping, and four accompanying firearm specifications. Appellant appeals his convictions, contending that the trial court erred in basing its verdict in part upon the testimony of a prison informant. We affirm.

{¶2} This case involves a murder for hire. The intended victim was Daniel C.

Ott. The murder victim was Daniel E. Ott. Accordingly, Daniel C. Ott will be referred to as "C" and Daniel E. Ott will be referred to as "E."

{¶3} Before 2004, Joseph Rosebrook ran a lucrative chop shop for stolen motor vehicles in Bellefountaine, Ohio. C stole cars, especially Corvettes, for Rosebrook. Curtis Frazier worked as a mechanic in Rosebrook's garage.

{¶4} The chop shop was the subject of an extensive investigation by the Logan County Sheriff's Department. Ultimately, Frazier agreed to work as an informant for the state and provide evidence against Rosebrook. Upon learning of this, Rosebrook hired C to murder Frazier. Instead of following through with the plan, however, C flipped on Rosebrook who was ultimately convicted of attempted murder. While serving his ten-year prison term, Rosebrook contrived to murder C.

{¶5} As of May 26, 2006, E, no relation to C, was living with his girlfriend, Maryann Ricker, in a home on State Route 700, Burton, Geauga County, Ohio. As E had recently accepted a job in another state, the two were in the process of moving. Their belongings were cleared from the second floor bedrooms, and they were, therefore, sleeping on an air mattress in the first floor living room.

{¶6} At approximately 6:30 that morning, Ricker heard their dog moving in the adjacent kitchen. After momentarily falling back to sleep, she woke up hearing footsteps on the second floor. As she was waking E, Ricker turned toward the doorway to the living room and saw appellant at the foot of the stairs holding a shotgun.

{¶7} Initially, he ordered E and Ricker to lay on their stomachs. He also ordered E to get off the air mattress and lay directly on the floor. Appellant asked E to identify himself. Ricker pulled a blanket over her head, frightened that she was about to die. She then heard the sound of duct tape that appellant used to confine E's hands.

2

{¶8}   After a few moments, appellant walked from the living room toward the back door of the residence.  E freed his hands, got up, and chased appellant into the dining room.  Ultimately, appellant shot E in the chest.  Appellant fled the scene and drove away.  Unhurt, Ricker immediately contacted the authorities for help.  Notwithstanding, E died of the gunshot wound.

{¶9}   Detective Juanita Vetter of the Geauga County Sheriff's Department spearheaded the investigation.  Detective Vetter and her colleagues followed up on a number of dead-end leads during the two months after the murder.  In August 2006, another detective with the department was running a search on E when he noticed that an officer with the Ohio State Highway Patrol had conducted a search on "Daniel Ott."  Upon calling the officer, the detective asked why he was looking for information regarding the victim.  The officer replied he was not looking for E but instead was inquiring as to C, the known auto thief from Logan County, Ohio.

{¶10}  In light of this, the Geauga County detectives contacted a number of people, including C about a possible connection.  C suggested that the detectives speak to the Logan County Sheriff's Department so that they could learn the details of the prior investigation into the Rosebrook chop shop.  In turn, a member of the Logan County department, Detective Keith Levan, placed the detectives in contact with persons who had been associated with Rosebrook, including Frazier.  However, no legitimate leads were generated.

{¶11}  Approximately three years later, in September 2010, Logan County Detective Levan contacted Detective Vetter with information on the murder.  According to Levan, he recently spoke to an informant, Terry Current, an inmate at a local state prison.  Current informed Levan that a second inmate at the state prison, Richard

3

Carter, had developed a relationship with a third inmate, appellant, who had divulged facts regarding the murder. As a result, Detective Levan interviewed Carter at the prison, and gave Detective Vetter a summary of the interview.

{¶12} Based on the summary, Detective Vetter asked Detective Levan to further interview Richard Carter. From September 2010 until February 2011, Levan interviewed Carter six times. Carter told Levan that he worked in the prison law library, and that appellant approached him for assistance on a separate domestic violence matter. Carter further stated that, as he and appellant became better acquainted through the weeks, appellant began to tell him about the murder.

{¶13} According to Carter, appellant told him: (1) after being released from prison in March 2006, he was hired to find and murder C; (2) on May 25, 2006, he drove to Geauga County in a vehicle owned by a female friend, later identified as Mindie Mock Stanifer, who accompanied him on the trip; (3) on the night before the murder, someone showed him where C supposedly lived; (4) the next morning, he drove back to the house with Stanifer, went into the house through the back door, and found two people inside; (5) upon taping E's wrist, he realized that E was too young to be C, the person he was hired to murder; (6) thus, he tried to leave without further incident, but E caught up to him before he get out; (7) when he turned around, E was threatening him and the shotgun went off; and (8) he then got back into the car and drove away while Stanifer vomited in the car.

{¶14} Carter remained in prison until September 2011. On his release date, Detective Vetter interviewed Carter for the first time. Carter confirmed the majority of the statements provided Detective Levan regarding conversations he had with appellant. No immediate arrests were made.

4

{¶15} Based upon separate information, the Geauga County detectives believed that, in addition to Stanifer, someone else was in the vehicle at the murder scene. When the detectives subsequently found Stanifer in Florida, she was initially unwilling to cooperate. However, when she had legal problems in May 2015, she spoke to the detectives about the murder and identified Alva Jacobs as the other person at the scene of the murder.

{¶16} Thereafter, appellant was arrested for E's murder. In June 2015, he was indicted on one count of conspiracy to commit aggravated murder, two counts of aggravated murder, and two counts of kidnapping. The first aggravated murder charge alleges that appellant committed the murder with prior calculation and design. The second aggravated murder charge alleges the murder occurred while appellant was committing the underlying offense of aggravated burglary. All counts carried firearm specifications.

{¶17} Following arrest, appellant was confined in two county jails for the entire nine months before his April 2016 trial, some of the time in the Lake County jail and some of the time in the Geauga County jail. During this time, two inmates contacted the prosecutor's office and provided information regarding E's murder. Each inmate asserted that he talked to appellant while inside the jail, and that appellant admitted his role in the murder. Both subsequently testified at trial.

{¶18} During the same time frame, Detective Vetter followed up on information that after driving two to three miles from the murder scene, appellant pulled into a side road accessing an oil well, exited the car, and took off his outer layer of clothes because they were blood stained; a local homeowner observed this and asked appellant if he needed help. After conducting a door-to-door search of the area, Detective Vetter

5

ultimately found Eli Yoder, who recalled the event and testified at trial.

{¶19} Shortly before trial, appellant gave notice of alibi and identified Jason Harvey as a potential witness. Appellant worked for Harvey after his release from prison in March 2006. Detective Vetter contacted Harvey on multiple occasions, and informed him of the seriousness of committing perjury and attempted to verify that Harvey had signed an affidavit concerning his knowledge of where appellant was on the date of the murder. In light of the detective's actions, appellant moved the trial court to dismiss the entire indictment on the grounds of government misconduct. After holding a separate hearing, the trial court denied the motion.

{¶20} At trial, the state relied heavily upon prison informant Carter's testimony. After the close of evidence, the trial court issued a written decision setting forth its findings. In regard to Carter, the trial court noted that, although his testimony had inconsistencies, Carter explained that he was merely restating what appellant had told him. The court further found that Carter's testimony concerning the events inside E's residence was consistent. In addition, the trial court found that there was no reason to believe that Carter was biased against appellant and was simply trying to "set him up" for the murder.

{¶21} The trial court found appellant not guilty on the conspiracy and aggravated murder counts, but guilty of two lesser included murder offenses, both kidnapping counts, and all four firearm specifications.

{¶22} The trial court merged the murder counts and sentenced appellant to fifteen years to life. The court merged the four gun specifications and imposed one consecutive three-year term. The trial court imposed concurrent ten-year terms on the kidnapping counts, but consecutive to murder count. Appellant's aggregate prison term

is twenty-eight years to life.

{¶23} Appellant raises four assignments of error:

{¶24} "[1.] The trial court violated Mr. South's rights to due process and a fair trial when it entered judgments of conviction for murder, kidnapping, and related specifications against the manifest weight of the evidence. Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 16, of the Ohio Constitution.

{¶25} "[2.] The trial court erred in overruling Mr. South's Motion to Dismiss for Government Misconduct. Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 16, of the Ohio Constitution.

{¶26} "[3.] The trial court violated Mr. South's right to confront and cross-examine witnesses when it curtailed cross-examination. Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 16, of the Ohio Constitution.

{¶27} "[4.] The trial court violated Chad South's right to due process and a fair trial through cumulative error. Fifth and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution."

{¶28} Under his first assignment, appellant maintains that the trial court erred in finding Carter's testimony credible. He argues that his pretrial statements to Detective Levan had too many inconsistencies for his subsequent trial testimony to be credible.

{¶29} "'[A] "manifest weight" challenge requires the reviewing court to play the role of a "thirteenth juror." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. * * * For an appellate court to overturn a conviction as against the manifest weight of the evidence, it must be found that "the jury clearly lost its

7

way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, * * *, 485 N.E.2d 717.' *State v. Kovacic*, 11th Dist. Lake No. 2010-L-065, 2012-Ohio-219, ¶37." *State v. Grega*, 11th Dist. Ashtabula No. 2012-A-0036, 2013-Ohio-4094, ¶70.

**{¶30}** Although an appellate court is obligated to review the credibility of the witnesses in a manifest weight analysis, the determination of credibility still primarily lies within the sound discretion of the trier of fact because the trier of fact is in the best position to make that determination. *State v. Clark*, 11th Dist. Ashtabula No. 2002-A-0056, 2003-Ohio-6689, ¶19-20.

**{¶31}** In challenging Carter's credibility, appellant focuses on the series of interviews Carter had with Detective Levan in 2010. He emphasizes relevant facts of the murder varied from interview to interview. For example, during one interview, Carter quoted appellant as stating that he shot the victim in the head rather than the chest. Appellant further notes that Carter changed the name of Stanifer who waited in the car and the manner in which the car was later disposed.

**{¶32}** As part of his process of informing Detective Levan, Carter would have conversations with appellant and then convey the contents of the conversations to the detective. Carter testified that he tried to write notes after each conversation with appellant, but there were sometimes long delays between the conversations and when he could write the notes. Thus, there was some need for recollection which explains some of the inconsistencies. In addition, Carter merely reported to the detective what

8

appellant said to him. If appellant changed the facts or names, Carter relayed the changes.

{¶33} In regard to Carter's interviews with Detective Levan, appellant points out that two were held after appellant had already been released from the prison, and that Carter provided additional information at that time, proving that Carter was getting his "information" from other people in the prison, not appellant. However, Carter explained that he would provide additional information not originally conveyed to Levan as he would later remember.

{¶34} There were also inconsistencies in Carter's trial testimony. However, the inconsistencies are inconsequential. As the trial court noted, Carter's testimony was consistent on the following: "[Appellant] had been hired to kill Dan Ott. He went into a house in the early morning hours in May, 2006, to kill Dan Ott. He discovered that the man in the house was named Dan Ott, but that he was too young to be the man South had been hired to kill. He was trying to leave the house when Dan Ott came at him with something in his hand. He shot Dan Ott with the shotgun that he had brought into the house. He was covered in blood and went out to the car he had driven to the house. The young lady, a drug addict, who was with him vomited on the seat of the car when she saw the blood. While leaving the scene, he struck something with the car and dented it."

{¶35} As part of its "credibility" analysis, the trial court stated that Carter had no motivation to lie because he was not compensated for telling Detective Levan about the conversations. Appellant asserts that this is incorrect, because Carter received $115 from the detective. Although appellant's assertion is correct, Carter also provided information to Detective Levan on other investigations. Moreover, Carter's prison term

was not reduced.

{¶36} Carter's testimony does not contain any integral inconsistencies rendering his testimony unbelievable. Rather, the extent of his knowledge of the facts supports the trial court's conclusion that his knowledge is based on conversations with appellant. Accordingly, the trial court did not lose its way. Furthermore, his testimony, in conjunction with the state's other evidence, satisfies the elements of murder and kidnapping.

{¶37} Appellant also argues that the Geauga County's Sheriff's Department's investigation was flawed because it was too focused upon Richard Carter and the "Logan County" connection. He emphasizes that, even though the department received much of the same information Carter gave from other prison informants in 2006, the detectives did not then pursue the information. It was only when Carter gave similar information in 2010 that the detectives acted.

{¶38} This observation, however, even if true, has no bearing on his convictions.

{¶39} Last, appellant argues for reversal of his murder conviction alleging the trial court reached a "compromised verdict." Specifically, he argues that Carter's testimony does not support the finding that he committed the murder without prior design and calculation.

{¶40} Carter, however, testified that when appellant realized he had the wrong Ott, he tried to leave the home without going through with the murder. To this extent, if believed, the prior calculation and design no longer existed.

{¶41} The trial court did not lose its way believing Carter's trial testimony. Accordingly, the court's verdict is not against the manifest weight of the evidence and appellant's first assignment is without merit.

10

{¶42} Under his second assignment, appellant challenges the trial court's denial of his pretrial motion to dismiss on the basis of governmental misconduct. He maintains that the evidence he introduced in support of the motion shows that the detectives associated with the Geauga County Sheriff's Department intimidated witnesses who otherwise would have testified favorably. In support, at the dismissal hearing, Jason Harvey testified that a detective tried to intimidate him by emphasizing that he could be subject to perjury charges if he chose to testify at trial.

{¶43} Ohio law recognizes that "[a]n accused may put the conduct of the police or their agent into issue by arguing that such conduct is so outrageous as to violate due process. *Rochin v. California* (1952), 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183." *State v. Doran*, 5 Ohio St.3d 187, 192, 449 N.E.2d 1295, fn. 4. In relation to the state's use of coercion, the behavior must be "'particularly egregious'" in order for it to be considered "outrageous" for purposes of a due process violation. *State v. Gaines*, 193 Ohio App.3d 260, 2011-Ohio-1475, 951 N.E.2d 814, ¶44 (12th Dist.), quoting *United States v. Mosley*, 965 F.2d 906, 912 (C.A.10, 1992). Stated differently, "'revulsion to the tactics [used by the state] must be overwhelming and universal * * *.'" *Id.*, quoting *State v. Cunningham*, 156 Ohio App.3d 714, 2004-Ohio-1935, 808 N.E.2d 488, ¶29.

{¶44} Jason Harvey believed the detectives tried to intimidate him in three respects. First, the detectives expressly warned Harvey not to get involved in the case because the state's case against appellant was strong and he might be subject to perjury charges if he testified. Second, when Harvey executed an affidavit regarding his proposed testimony, Detective Vetter texted him on multiple occasions, seeking to verify that he signed the affidavit. Third, the detectives tried to cause problems in Harvey's life by contacting the mother of his minor child and informing her that Carter was

11

unnecessarily "involving" himself in a murder investigation.

{¶45} Although Harvey refused to testify at trial, the court considered Harvey's dismissal motion testimony. Moreover, Harvey fully explained why he believed it would have been impossible for appellant to have committed the murder in Geauga County. Thus, appellant was not denied due process by Harvey's failure to appear at trial.

{¶46} Appellant further asserts that the detectives intimidated another potential alibi witness, Chad Malay. According to Harvey, Malay and appellant were assigned to work together on the day of the murder, and Malay would have told Harvey if appellant missed work. During the motion hearing, appellant presented evidence tending to show that Detective Vetter spoke with Malay at some point during the investigation. But there was no evidence concerning what the detective said to Malay. As a result, appellant has not established outrageous conduct.

{¶47} Appellant also submits that Stanifer and Jacobs would have been favorable witnesses had detectives not intimidated them during interrogation. Although defense counsel presented a legal argument during the motion hearing as to how the detectives' actions resulted in a violation of his right to a fair trial, no proffer was made regarding the substance of Stanifer's and Alva's proposed testimony. In the absence of a proffer, this court cannot determine whether their testimony could have affected the trial's outcome and, thus, whether appellant was denied a fair trial. *See State v. Archibald*, 11th Dist. Lake Nos. 2006-L-047 and 2006-L-207, 2007-Ohio-4966, ¶43.

{¶48} Appellant separately contends that he was denied a fair trial when Detective Vetter searched his Lake County jail cell and reviewed his personal papers regarding the upcoming trial. As of February 2016, approximately nine months after he was indicted, appellant was being held in the Lake County jail. Earlier, he had been

transferred from the Geauga County jail to Lake County because he was attempting to communicate with one of his co-defendants. At that time, Detective Vetter obtained information from a prison informant that appellant was receiving mail at the Lake County jail from the co-defendant. Consequently, she obtained a search warrant and searched the contents of his jail cell, including the papers appellant had concerning his case. Although the detective did not find any letters from a co-defendant, she made copies of all papers she found and forwarded them to the Geauga County Prosecutor for review.

{¶49} Appellant asserts that Detective Vetter's actions violated his due process rights because the papers are subject to attorney-client privilege. At the motion hearing, Vetter testified as to the papers confiscated. Some of the papers were personal letters not about the case. The remainder of the papers consisted of his notes of the audiotapes of the 2010-2011 interviews between Detective Levan and Carter. The notes, however, do not contain any communication between appellant and defense counsel regarding trial strategy. The papers were, therefore, not covered by attorney-client privilege. Moreover, appellant has failed to show that the state's review of the papers denied him a fair trial. Appellant's second assignment is not well taken.

{¶50} Under his next assignment, appellant maintains that the trial court violated his constitutional rights by restricting the scope of his cross-examination of three state witnesses. He argues the court erred in not permitting him to refresh the recollection of the witnesses through tape recordings of interviews, depositions, and telephone calls.

{¶51} While cross-examining Detectives Keough, Detective Logan, and Carter, defense counsel sought to refresh their memories with statements other prison informants made during prior interviews. The trial court did not allow this line of questioning. Without reaching the propriety of these rulings, appellant failed to proffer

13

the expected responses. Accordingly, appellant failed to show prejudice. *Archibald*, 2007-Ohio-4966, at ¶43.

{¶52} Under his last assignment, appellant argues cumulative error. Although a criminal conviction can be reversed on the grounds that the cumulative effect of legal errors throughout the trial resulted in a deprivation of the right to a fair trial, the doctrine is inapplicable absent multiple instances of harmless error, not present here. *State v. Boynton*, 8th Dist Cuyahoga No. 93598, 2010-Ohio-4248, ¶60 quoting *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). Therefore, appellant's fourth assignment is without merit.

{¶53} The judgment of the Geauga County Court of Common Pleas is affirmed.


CYNTHIA WESTCOTT RICE, P.J.,

TIMOTHY P. CANNON, J.,

concur.